ROGER TATE *et al.*, Petitioners, v. POLLUTION CONTROL BOARD *et al.*, Respondents.

Fourth District No. 4—89—0061

Opinion filed September 28, 1989.

Thomas L. Kilbride, of Klockau, McCarthy, Ellison & Marquis, P.C., of Rock Island, for petitioners.

Lawrence R. Fichter, State's Attorney, of Decatur (Thomas H. Moody, Assistant State's Attorney, of counsel), for respondent Macon County Board.

Hull, Campbell & Robinson, of Decatur (Jon D. Robinson, of counsel), for respondent Macon County Landfill Corporation.

JUSTICE SPITZ delivered the opinion of the court:

Roger Tate, Lynette Tate, Barbara Kelley, and Joseph Kelley (petitioners), have filed a petition for direct review in the appellate court of a final administrative order of the Illinois Pollution Control Board (IPCB) entered on December 15, 1988, affirming the decision of the Macon County Board (County Board) which granted site-location suitability approval to the Macon County Landfill Corporation (MCL) to expand an existing landfill, with conditions, pursuant to section 39.2

of the Environmental Protection Act (Act) (Ill. Rev. Stat. 1987, ch. 111½, par. 1039.2). MCL filed an initial request on November 9, 1987, and an amended request for site approval for the extension of an existing landfill with the County Board on January 14, 1988. The amended request comprises three pages with two exhibits, one being a legal description and the second being the notice provided to local residents. The request asks permission to extend MCL's existing landfill facility. This application was later clarified to be a request to accept nonhazardous special waste and to increase the design height of the landfill. No other documents were filed with the request, even though MCL had previously submitted to the Illinois Environmental Protection Agency (IEPA) applications and related documents pertaining to the issuance of a developmental permit to handle nonspecial waste on the expanded site. An operating permit had not yet been issued. In addition, MCL filed an amended petition altering the original petition only insofar as the acreage requested to be approved for the expanded facility was reduced from 42 acres to 25 acres. The amended petition makes brief affirmative assertions regarding each of the six statutory siting criteria, and asserts that, because MCL has filed no request or related documents with the IEPA regarding the application, no other documents are submitted.

The seven-member committee (Committee) of the County Board conducted hearings on April 21 and 22, May 5, 12, 18, and 19, and June 2, 1988. The Committee also took a formal 40-minute tour of the MCL site on May 24, 1988, accompanied by Roger Tate, and Paul McKinney, the site operator. Final arguments were presented on the last hearing day, June 2, 1988. Thereafter, the Committee met on June 9, June 16, June 23, June 30, and July 6, 1988, to deliberate. On July 6, 1988, the Committee voted unanimously to recommend approval. The approval included five numbered conditions and one narrative condition.

On July 12, 1988, the County Board, by resolution, concurred in the Committee's recommendation that MCL be permitted to accept special nonhazardous waste and to increase the design height of the landfill 40 feet, subject to the following conditions: (1) an increase in the number (from three to nine) and depth of the monitoring wells; (2) a 10-foot clay liner compacted to "a 10 to the minus 7" be placed under and on the sides of the proposed landfill, noting that the present site has no liner; (3) relocation of a gas pipeline and vacation of the present easement; (4) removal of the existing pipeline; and (5) the entire landfill area be out of the flood plain or be flood proofed. The County Board resolution also contained a Committee recommendation

that MCL be required "to develop and submit to the Macon County Board for review, a ten-year plan for waste disposal, including a plan for two years." The IPCB concluded that, as the resolution is drafted, this narrative recommendation also appears to be a condition.

The facility extension in question encompasses what is called sites 3 and 4. Site 4 encompasses only two acres of the expanded facility. Immediately east of site 3 is an existing active landfill operation of 25 acres, designated site 2. Site 2 has been in operation since 1971 and is permitted to take general and special waste. Further east, on the other side of site 2, is a closed 20-acre facility, site 1, originally opened in 1960.

To the west of sites 3 and 4 are about 30 acres of undeveloped pasture land owned by MCL. To the north, across Hill Road, are homes. To the south is the Sangamon River and, to the east of site 1, across the interstate, are the sludge pits of the Decatur Sanitary District.

At the Committee hearing there was some initial confusion as to what constituted a new regional pollution-control facility at the MCL site. In 1977, 1978, and 1979, MCL had applied for, and received, development permits and supplemental development permits for sites 3 and 4. These development permits allow disposal of general, municipal, solid waste, not special waste, and limit the height of the landfill to 40 feet below what is now requested.

Less than a month after filing the amended application to extend the facility, on February 9, 1988, MCL notified the County Board that it had discovered the statute creating the procedure for approval of new regional pollution-control facilities had a "grandfather clause," which exempted from the process those facilities which earlier had been issued development permits. The letter sent to the County Board on behalf of MCL states that MCL is "only requesting approval to fill the unpermitted area with nonhazardous special waste and/or liquid waste, and to increase the permitted elevation of this site so as to be the same as the adjoining landfill." (See Ill. Rev. Stat. 1987, ch. 111½, par. 1003.32.) The letter stated that it hoped to proceed on the existing amended petition with the understanding that MCL was only requesting approval for variance from the existing development permits. In correspondence dated April 14, 1988, addressed to the County Board, petitioners challenged MCL's February 9, 1988, correspondence and complained that the material change in the location of the site, as well as the other amendment, presented jurisdictional problems such that MCL should be required to withdraw the request and issue new notices.

At the hearing on April 21, 1988, petitioners also asked MCL to disclose technical exhibits. MCL refused to do so. At the hearing on May 5, 1988, MCL submitted to the County Board the technical documents previously submitted to the IEPA. These documents, variously dated September 1977 to October 7, 1979, include descriptions of site characteristics, including hydrology and geology, site development plans; operating plans and procedures; permeability testing results and construction proposals to contain leachate; and the application to the County Board to permit the development of the site submitted in August 1979, with the attachments thereto. When MCL produced the exhibits at the May 5, 1988, hearing, petitioners objected and moved to dismiss the proceedings on the ground that the failure to file the documents with the request for site approval made to the County Board constituted a jurisdictional defect under section 39.2(c) of the Act. (Ill. Rev. Stat. 1987, ch. 111½, par. 1039.2(c).) This issue was also raised before the IPCB, and it was rejected. However, it is precisely on this point that three members of the IPCB dissented, suggesting that the failure to include this information with the request is a violation of fundamental fairness. The IPCB majority noted petitioners' attorney, when asking for the technical data at the first hearing, asserted that after the amendment to section 39.2(c) becomes effective on July 1, 1988, such information would be required to be filed with any siting application, and argued that, nevertheless, the County Board possessed an implied power to require such information based on principles of fundamental fairness. "Jurisdiction" was not mentioned.

When petitioners requested presubmittal of MCL's technical data and expert witnesses, MCL refused, saying the County Board could have the information, but that the opposition was not entitled to it, and noted that the opposition did not offer to presubmit anything in return. The assistant State's Attorney advised the County Board that principles of fundamental fairness do not include the rules of discovery. He further stated that "about all we can do in these proceedings is try to be as open as possible." The committee chairman and two committee members felt that the request could delay hearings and cause additional prejudice and, in any event, additional hearings could be held. It was decided that the rules did not allow ordering compliance with such a request in light of the fact the proceedings had already begun, noting that after the documents were introduced, the Committee would consider what was necessary to ensure the fairness of the hearing.

In arguing this issue before the IPCB, petitioners presented an al-

ternative argument asking the IPCB to strike the MCL exhibits if there was found to be no connection between the current proceeding and the prior filings with the IEPA. The IPCB majority declined to find there was no connection, but nevertheless decided there was no jurisdictional requirement that the documents be filed with the request.

The petitioners contend there were additional jurisdictional defects in that the request's stated location of the expanded site was outside the 100-year flood plain and the request failed to describe any vertical expansion or the proposed activity of accepting special waste. MCL acknowledged the description of the site was not accurate and that the site was within the 100-year flood plain. No new application was submitted and new notices were not issued. Noting that section 39.2(b) of the Act requires only that the notice disclose the location of the proposed site, without reference to "flood plains," the IPCB, without dissent on this point, found the description in the notice did not constitute a jurisdictional defect.

The County Board's resolution did not find the facility to be located outside the 100-year flood plain or that the site is flood proofed. MCL did not submit any plans for flood proofing the site. The County Board's exhibit No. 3, a 1984 FEMA (Federal Emergency Management Agency of the Department of Housing and Urban Development) map, relied on for flood insurance rate purposes, was introduced, as was a map based on aerial photographs taken in 1983 relied on by the County for tax purposes, but which does not indicate the 100-year flood plain. The IPCB indicated there was general agreement for the need for a new topographical study to ascertain the current flood plain. In addition, the minutes of the County Board landfill organizational meeting of March 23, 1988, indicate the "bottom portion" of the landfill is in the flood plain. MCL's engineering expert, Gregory Kugler, testified a berm would be placed at the edge of the fill above the flood plain. He and Paul McKinney indicated the surveying work had not been completed and the areas of the flood plain and landfill had not been identified. The only documentary evidence admitted concerning the flood plain showed the location of the flood plain in 1984. Correspondence from Michael Bender of the Illinois State Water Survey, dated July 1, 1988, stated the FEMA maps exclude certain formations and there is flooding likely upstream and downstream in the area of the proposed site.

On the merits, the IPCB dissent would have reversed the approval of the County Board on two points: (1) site safety and (2) minimization of incompatibility of the site to the public. As to the safety

factor, the dissent referred to the failure to present a design. Furthermore, the petitioners' witness, Mike Duffin, a research assistant at Central States Resources with a Ph.D. in geology from the University of Illinois, testified that continuous bore sampling had never been done. The failure to do a continuous bore sample could leave a gap resulting in another type of sediment being present. IEPA regulations now require continuous bore samples while they were not required in 1978. Borings had not been done deeper than 18 feet and cation exchange capacity tests to determine the ability to hold back toxic cations or molecules had also not been done. The dissent also focused on the testimony of Thelma Reed, a local resident, who testified on June 2, 1988, that a large pool of water, about 120 feet long, 40- to 50-feet wide, and quite deep, had appeared on May 28, 1988, which this witness believed resulted from the landfill cutting into her well and thereby contaminating her drinking water.

Concerning the incompatibility of the site to the public, the dissent relied on the fact that no vertical expansion plans were filed, no plans existed to screen the higher height, no consideration of visual screens such as trees or berms were presented, and Thelma Reed lives 25 feet from the site. The dissent concluded this witness should have some screening to mitigate the visual impact of the new landfill.

The majority decision of the IPCB summarized the testimony of the witnesses before the County Board. The stated intent of MCL was, if the County Board approved, to operate the new acreage in the same manner as the existing acreage and to continue to accept general as well as special waste, as MCL is doing now. Absent approval, MCL will develop the expanded acreage to accept only general, household waste as allowed by the existing permits, except that without the increased height, the expanded acreage will last only 5 years, not the 10 years stated in the request.

First to testify were individuals invited by the Committee. Lee Holsapple, since 1986 the sheriff in Macon County, with 22 years of service in the sheriff's office prior to that, testified MCL is two or three miles southwest of Decatur. Regarding traffic, he received no complaints about MCL in the past two years. Over the years he recalls only complaints of refuse blowing out of vehicles onto the highway, but his office always received cooperation from MCL to resolve the problem. He knows of no existing traffic problem from the refuse trucks. The sheriff acknowledged his office logs complaints only when there are follow-up investigations or arrests, and that it is possible complaints made to other officers had not come to his attention.

Gary Fogerson, for 11 years the coordinator of the Macon County

Emergency Services and Disaster Agency, testified the only complaint to his office regarding MCL involved a truckload of paint filters, a hazardous waste, erroneously shipped to the landfill. Remedial action had already been initiated before Fogerson's agency became involved. He also noted that files are maintained containing information on the type of waste MCL receives.

Charles Burgener, for 17 years the engineering technician for the Macon County Highway Department, testified his office has no knowledge of present traffic problems in the landfill area, including on Hill Road. The traffic count on the north-south township road intersecting with Hill Road near the entrance to the site is 150 to 399 vehicles per day, a moderate township road traffic count since most township roads have less than 100 vehicles per day. A State roadway map shows about 40 to 45 homes in the area, although he acknowledged that some homes shown on the map appear to be located in the existing landfill even though there were none there. He also noted his traffic counts were taken from a 1985 Macon County traffic map, which incorporated traffic counts in the county averaged on a 24-hour basis, prepared by the Illinois Department of Transportation in cooperation with the United States Department of Transportation.

Steven Gambrill, since 1981 chief of the Harristown Township Fire Protection District within which MCL is located, testified the department has received no traffic complaints concerning the intersection adjacent to the MCL entrance. Gambrill has been a volunteer with the department since 1967. Records compiled since 1984 show that the department answered 10 calls to MCL's operations, *i.e.*, five trash fires, two vehicle fires, one injured-worker call, one structural fire, and one false alarm. He testified the trash fires were extinguished with dirt. The vehicle fires involved a garbage truck with a hot load and a tractor. The landfill's own personnel was used to extinguish the fires under the supervision and assistance of the department. The structural fire involved a maintenance shed. The vapors from a fuel leak on one of the tractors being worked on was ignited by the heating source in the building, and this witness concluded this fire was unrelated to the operation of the facility as a landfill. They have had no trouble working with MCL, and there have been no calls relating to spills.

Paul McChancy, for 13 years the county planner with the Macon County Planning and Zoning Department, testified there are four landfills in Macon County: MCL, Rhodes, Bath Incorporated, and McKenny (Waste Hauling, Inc.). He presented a 1983 air photo used for tax mapping and kept updated based on property tax and building

permit records. He used it to identify home sites, identifying those within a half-mile radius from the borders of the site and those built since 1975. He testified that 26 homes were built since 1975, of which eight are within a half-mile radius. Forty-nine homes in all are within the half-mile radius. The area is fairly rural and the sources of water are private wells. The only complaints he received about MCL's operations occurred after the landfill filed its first request. These complaints were referred to the County Health Department or the IEPA. The complaints concerned blowing litter, digging activities in the expansion area, and possible expansion into a natural spring in the area.

Richard Rosetto, for 14 years a sanitarian with the County Health Department, testified he inspects all four landfills monthly. MCL is the only one handling liquid waste, and Decatur is an industrial town. Eighteen residents within a 1½-mile area had their wells tested in 1987 by the IEPA and the tests showed no contamination. He has received complaints about road dust and litter, which MCL promptly responded to, and a complaint about trucks operating at night a couple of years ago. MCL's operations are well above those of the other three landfills, primarily because MCL is well equipped.

Gary Anderson, mayor of the City of Decatur (City), testified the City supports the landfill request. The dumping fees in Macon County have increased 50% in the past two years, forcing increases in collection and disposal fees, and representatives from IEPA advised the City's staff that MCL has a good record.

On behalf of MCL, James Holderread, executive director of the Macon County Economic Development Foundation (Foundation), testified that industry needs expansion of MCL. The Foundation is working with a national consulting firm conducting a site search for a major new $50 million facility. The facility would create about 100 area jobs, but will not be located in Decatur unless there is enough industrial waste, including liquid waste, capacity.

Paul McKinney, the president of MCL Corporation, testified he previously operated the landfill which he sold to Waste Hauling, Inc., in 1980. He is familiar with its capacity, and Waste Hauling can accept waste for only a little over two years. He testified that the Bath Landfill is the only landfill that will be able to accept wastes for more than three years, but only demolition waste, and the landfill cannot accept general waste now. He stated that only two landfills in the county, one being MCL, accept general waste. He further states that if MCL's siting request is not approved, industrial liquid waste will have to be hauled as far away as Peoria, or to the Clinton site if it gets permits.

He also testified that MCL accepts 92% of its waste from Macon County and the bulk of the noncounty waste is from Monticello. He estimated MCL takes about 70% to 75% of the waste generated in Macon County and receives about 50% municipal waste and 50% special waste, although that changes depending on the needs of the community. For any waste sent outside the city limits of Decatur, whose population dominates the 125,000 population of Macon County, the hauling costs increase as the distance increases. So if the MCL facility is not available to Decatur, McKinney believes the cost of hauling will increase.

McKinney testified he did not consider capacity at the Waste Control site because he believed the site no longer had an active permit, although he did not know that. Nor did he consider capacity in nearby surrounding counties. He had no computation on waste imported into the county or exported from the county. Without County Board approval of the request, the facility, including sites 2, 3, and 4, still had a seven-year life span for acceptance of waste. McKinney had no calculations on the economic cost of transporting waste based on mileage.

McKinney stated he contacted two real estate appraisers, both of whom declined to give their opinion as to whether the expansion would improve or lower property values, because they said they could not prove it. He added, however, that of the 10 new homes built since 1975, he built and sold three himself, as well as one lot in his subdivision. He had no trouble selling them even though real estate was not selling well generally.

The landfill hours are 7 a.m. to 3:30 p.m. for acceptance of waste, and employees are on the site from 7 a.m. to 4 p.m., six days per week, generally, although MCL will accept late requests under special circumstances, such as when ADM had a breakdown.

Regarding night fires, MCL distributes cards to the immediate neighbors with McKinney's, the foreman's, and other corporation board members' phone numbers. He noted and agreed with the fire chief's testimony. He stated MCL has $1 million worth of equipment, including crawlers, loaders, tractors, earth movers, two power brooms to sweep dust, water pumps, and a fire truck in operating order.

He had never had a spill, hazardous or oil, and nothing has discharged to the stream. He has been the road commissioner of Harristown Township for 12 years. There has been no change in the existing traffic pattern or access road. If business increased, the traffic would be heavier, but it would be over the same roads.

He noted that MCL paid $60,000 in 1978 to pave the township

road after an increase in traffic caused by the new interstate forced a change in the entrance to MCL. The State's contribution was to design the road for garbage truck weights. Regarding vehicle mud, he is now building a one-half- to three-quarter-mile white rock road within the site to reduce dust and mud on the township road.

Regarding litter, he has seven people available to pick up paper, and there are permanent and portable fences. Paper is confined to his property unless a strong, 40-miles-per-hour south wind causes it to blow over the north fence.

There is a pipeline under the property that will have to be moved. That is a condition of the IEPA permit, and negotiations are in progress with the owners of the pipeline. He did not know whether the pipeline is in use.

He stated he has liability insurance with a $1 million umbrella policy. In addition, at the time the facility is to be closed, the IEPA would require the submission of a closure plan and the deposit of money in a trust fund. He also stated as soon as he gets through this expansion, he will be actively looking for future space. Decatur will be in trouble again in 10 years and the witness mentioned the problem of Champaign-Urbana, which has been working 10 years to solve landfill problems and has not been able to do so.

If the expansion is denied, only seven years remain, two on the existing site and five on the new, and this only contemplates acceptance of solid waste. He noted that if the situation gets tight, the corporation stockholders who are waste haulers might have to get preferential treatment.

After Richard Lutovsky, president of the Metropolitan Decatur Chamber of Commerce, testified in favor of the expansion, Greg Kugler, a technical specialist for Andrews Environmental Engineering (Andrews), testified. Referring to exhibit Nos. 10 through 16, the applications and the development permits for the site, Kugler testified that fires, spills, and other operational accidents are covered in the operating plan submitted to IEPA. A 10-foot clay liner, compacted as necessary to a permeability of $1 \times 10^{-7}$ cm/sec., is required as well as soil tests on a 200-foot grid. There are currently seven monitoring wells to detect leakage of contaminants, and three more were required for the new site. Andrews is involved in the pipeline issue and was involved in testing of the 18 private wells. Samples were taken but after the positive IEPA results, the samples were not tested.

Regarding the possibility of hauling waste 40 to 50 miles as suggested by the petitioners, Kugler stated this might be acceptable for a small town, but for Decatur this would be a tremendous hauling

burden. He stated Decatur is courting a problem to depend on another county. The site in Clinton, about 25 miles from Decatur, which recently received approval to expand, has not yet received permits, and the ability of its accepting waste from Decatur is thus speculative.

He testified Andrews used the IEPA publication, entitled Available Disposal Capacity for Solid Waste in Illinois, to determine landfill capacity in Macon County and the surrounding counties. Andrews determined the surrounding counties had very little capacity to take added waste from MCL. The Bath Landfill, with its current volume of waste, plus MCL's, would have less than one year. The Walter Sanders Landfill in Logan County would have less than one year. The Lovell Landfill in Moultrie County would have less than one year. The Christian County Landfill would have less than three years. Sangamon County, Sangamon Valley Landfill, would have a life expectancy of approximately five years. These life expectancies were all calculated by considering MCL's waste in addition to the waste now being accepted by the respective sites.

He testified that the current permits do not require a leachate collection system or gas migration controls, and the facility complies with existing regulations. He believes the liner and side wall liners would control both leachate and gas migration. It was noted that the plans are not final in many respects. For example, the vertical expansion is conceptual. MCL merely wants to go higher with what is presently being done. Gas vent trenches would be considered if there were to be a problem. Andrews is reviewing the adequacy of the monitoring wells and the monitoring program which were designed by another firm.

Kugler believes there is a need to establish plans for at least 10 years, reviewable yearly, since site capacities are shifting so much. Andrews has clients who doubled their landfill price and cut volume in half to extend the life of the sites. He stated that each year there are fewer sites and that McLean County Landfill, for one, will not accept special waste from outside McLean County.

He also sees nothing wrong with looking to the IEPA for technical guidance. Most counties do and to move in another direction can be a waste of money.

Gordon Dill, a consulting engineer, was hired by the county to study and make recommendations concerning the proposed expansion. He testified he reviewed the testimony and records concerning all four sites, including IEPA documents regarding design and requirements for sites 3 and 4, relocation of the pipeline, the bottom and

sidewall liner requirements, the requirement that any sand layers be removed before recompaction, and the site entrance and traffic patterns.

He recommended that the site be approved, stating that MCL will have to remove the pipeline, have a 10-foot clay soil liner on the bottom and sides compacted to a maximum permeability of $1 \times 10^{-7}$ cm/sec., both vertically and horizontally, have upgradient and downgradient monitoring wells to allow checking for groundwater, provide for litter and fire controls, and for sweeping and wetting down the entrance road. He stated that the entrance to the landfill was designed by the Illinois Department of Transportation (IDOT) 10 years ago to handle loaded garbage trucks and that the traffic pattern will not change. He included one condition, that the pipeline be removed from the site prior to construction of the 10-foot-thick berm.

He noted that many design aspects will be precisely determined in response to surveys and soil problems found during the development and operational stage. For example, he felt that it is sufficient to know at this stage that any sand layers will have to be removed. The sand and dirt will have to be removed anyway to get proper recompaction. He agreed that field tests are preferable to laboratory tests, and that the monitoring wells should be at the correct elevation to assure proper sampling. He essentially felt that, although the soil sample and other data before the County Board presently do not contain all of the material, it is clear that MCL will have to gather sufficient data to assure that these goals are met before an operational permit will be issued.

He also assumed the existing traffic pattern would not change unless there is a radical change in the growth of Decatur and its industries. On his site visit he saw one person picking up some blowing litter.

The first witness called by petitioners was Ethel Hand, who has resided one-half mile west of the MCL facility for about 30 years. Hand testified there has been a change in the quality and quantity of her well water over the last 10 to 15 years, but acknowledged that Rube and Merle's dump, which she believes is an illegal dump, is located directly to the south of her house and that she has fought it for years.

Barbara Kelley has lived near the landfill to the west on Hill Road for about 10 years. Her property line is less than 250 feet away at the closest point. The landfill does not protect her health. There is road mud and thick dust. There are odors. There is no screening of the view. Litter blows on her property, endangering the horses she raises

for show. She presented pictures taken starting in November of 1987, depicting the dust, uncovered garbage left overnight, pigeons and sea gulls in the trash, large semi-trucks in the area, standing water on site 3, debris in the area, the fence on site 2, and the landfill height as compared to her barn. She acknowledged that the fence was there when she moved in 1977, but is closer now. The nearby Decatur Sanitary District sludge pit smells, but not as bad as the landfill. The prevailing winds are away from her house. For two years prior she made only one complaint, about dust, which resulted in MCL watering down the dust for only two or three days.

John Thompson, for about 4½ years executive director of Central States Education Center and the Central States Resources Center, has a bachelor of science degree in chemical engineering. He testified that among the documents he reviewed were the computer printouts of IEPA manifests regarding the Rhodes, Clinton, Waste Hauling, Waste Control, and MCL landfills. He introduced as objectors' exhibit No. 11 the IEPA book titled Available Disposal Capacity for Solid Waste in Illinois, commonly called the "Green Book" and referred to earlier by Kugler. He calculated that, if the County Board denies the expansion, sites 3 and 4 would have 8½ to 9½ remaining years, because the IEPA permitted lowering the bottom elevation 25 feet in 1979.

Regarding testimony concerning the Clinton waste disposal site in De Witt County, which has received local siting approval, the hearing officer sustained MCL's objection that absent an IEPA operating permit, Clinton waste disposal site capacity cannot be considered because it is speculative. The petitioners asserted that it ought to be considered because the county could prospectively condition its approval on whether the Clinton site is permitted. Before the IPCB, petitioners made an offer of proof that a Clinton landfill located within 15 miles of the subject facility had obtained local siting approval with a 50-year capacity. The offer of proof was rejected by IPCB.

Thompson presented calculations on the amount of special waste generated inside Macon County and disposed of at MCL for which there are special waste permits in 1988 and beyond, as well as special waste needs generated outside Macon County but disposed of at MCL, and the distance the waste is transported. Similar information was also presented for the Waste Hauling landfill. Thompson asserted that the special waste volume at MCL does not represent 20%, 30%, or 50% of the total. Using the Green Book, he concluded it is more like 5%. The two main generators are Staley and ADM in Decatur. He asserted that special waste has a larger service area. The Villa

Grove landfill in Douglas County, about 40 miles away, does accept special waste, but also currently accepts waste from Champaign-Urbana.

Thompson testified there is no design for expansion in the record. There are no leachate estimates, and special waste needs to have a more strenuous design such as a leachate collection system. There is no specific information as to whether the soil needed to cover the waste is available on the site. He testified there is no plastic liner proposed, although acknowledged that he supported an Urbana expansion that had no plastic liner. The Urbana site, however, does not accept special waste. Thompson also noted there are no plans to add more screening, trees, or berms to accommodate the requested increase in height. He also testified three monitoring wells for the expanded site appear to be located in the Sangamon River flood plain.

Regarding the county sanitarian's inspections, he reviewed the inspection reports from April 1986 to April 1988 for the four county landfills. Leachate seeps were noted in 14 out of 24 MCL inspections, more than at the other landfills.

Michael Duffin of Central States Education Center and a geologist employed by the University of Illinois looked at 31 of MCL's borings, old IEPA statements and maps in relation to potential, usable acquifer sediments, and leachate protection and testified the geological data is highly speculative. The borings are discontinuous and attenuation tests are lacking. He felt the data is not sufficient to say, either way, regarding minimizing leachate migration. He acknowledged that the development permits require additional test borings before an operating permit will be issued. Any sand pockets have to be removed, although they could cause problems outside the fill area, and he is concerned that field testing is not specific. He said the glacial deposits in the area generally contain sand, which he believes creates a great deal of difficulty for locating landfills.

Thelma Reed has lived 25 feet from site 3 for 16 years and testified she fought the expansions in 1973 and 1975. There are dogs, rats, flies, roaches, and dust at the landfill. She rented land to MCL for offices but is not appearing as MCL's landlord for the proposed site.

Roger Tate has been a resident of property located on Hill Road approximately 1,000 feet west for 31 years. He testified that the landfill expansion's incompatibility with the surrounding property expansion cannot be minimized because the landfill is the tallest place in the area, a mountain of garbage. For the first time in 30 years, he killed four rats at his house the previous winter. He complained of dust,

noise, and the smell of rotting garbage. He believes that water is not safe even if the IEPA said it was. He asserted the IEPA checked only 60 to 80 "things" in the private well tests, even though there are 60,000 chemicals in almost everyone's home. He complained the landfill creates litter and one person cannot pick it all up.

Tate believes traffic is a problem. He believes the traffic patterns will change with trucks using Hill Road more frequently as the use of the landfill proceeds more to the west. He went into the ditch trying to avoid an earth mover on Hill Road when it was muddy last winter. To his knowledge, the sheriff did not respond to his complaint. Tate testified concerning noise and dust problems caused by the traffic at the existing site.

He believes the area is in the flood plain because he has seen it flood repeatedly. His private well tests conducted February 4, 1987, by National Testing Laboratories in Cleveland, Ohio, showed the level of lead above the recommended limits. The report indicates the lead can be removed by reverse osmosis or a distillation device. Also found was a high level of total dissolved solids which may result in unpleasant taste or odor. Clean, good-tasting water for drinking, cooking, and ice making could be obtained by using a third faucet with a reverse-osmosis filter or a distillation device. The report indicated bacteria can be removed by chlorination or ozonization of the water supply. There were hard water problems requiring a water softener and filtration system, and the water was found to be turbid, contributing to the unpleasant taste and odor, requiring a filtration device plus oxidation using ozone or chlorine to cure the problem. The report warned that if he lived near a landfill, a test should be conducted every year or two. It also warned against possible contamination from fertilizers and pesticides among other possible contaminants.

Tate is concerned that the expansion would move the landfill closer to his home and the pipeline will be moved to where the screening trees presently are located. If the trees are removed, there would be nothing to screen the landfill from his property. The IEPA and county inspectors do not require the landfill to comply with existing regulations in this witness' opinion. He has complained for many years to his County Board representative, his State representatives, the County Board of Health, the State Board of Public Health, the Attorney General's office, the IEPA, the road commissioner, and the sheriff, and very little is done to improve the situation.

Tate feels property values have diminished because of the proximity of the landfill. Five years ago he attempted to purchase at public auction the 30 acres onto which MCL is expanding. The Federal Land

Bank approved a $1,500-per-acre loan to buy the property. MCL paid $2,050 per acre for it. He acknowledged that the Federal Land Bank would not loan 100% of property value and that he opposed rezoning the land for a residential subdivision at a county hearing. Tate also acknowledged he sells dirt by leasing the southeast part of his property. That dirt is removed by backhoe and trucked out in a 1½-ton dump truck using Hill Road. He testified the weight of this truck is significantly less than that of a garbage truck. He stated he uses his well water for watering his cattle. For drinking and cooking water, he buys water and gets four gallons a day from his well through a reverse-osmosis system.

Reed testified again that, subsequent to her prior testimony, the water from her faucet was dirty after being excellent for 45 years. She took pictures down toward the river showing a large pond where MCL was removing earth and, although her well is upgradient, her well was affected when the equipment was active.

The last witness for the petitioners was Albert Valocchi, an associate professor of civil engineering at the University of Illinois. He conducts basic and applied research in groundwater hydrology and contaminant movement in soils and aquifers. After reviewing the petitioners' exhibit Nos. 7, 8, 10 through 16, County Board exhibit No. 8, a few of the objectors' exhibits, and groundwater monitoring data collected by IEPA, Valocchi testified the existing groundwater monitoring system is inadequate. He particularly noted that the bottoms of the proposed monitoring wells are above the proposed bottom grade of the landfill such that leachate through the bottom of the landfill could not be detected. According to this witness, laboratory permeability tests are inadequate, and he believes the landfill has a high potential to degrade local groundwater resources. He asserted that the monitoring wells are not deep enough and would detect only side leakage. Groundwater that currently flows to the Sangamon River cannot be assumed to continue if leachate mounding occurs. Upgradient wells could be affected. Reed's well problem might have been affected if a "permeable unit" was ruptured during excavation. This is to say, the source of Reed's well could have some connection to site 3. Certain types of organic liquids can drastically affect the permeability of compacted clay liners, and the liquid special wastes accepted by MCL are similar. The witness has seen no plan to assure the quality of the construction of a clay liner for low permeability.

With respect to the fourth siting criterion of section 39.2(a) (Ill. Rev. Stat. 1987, ch. 111½, par. 1039.2(a), "the facility is located outside the boundary of the 100-year flood plain or the site is flood-

proofed," the MCL application states simply as follows:

"6. [T]hat the proposed landfill extension is located outside the boundary of the 100 year flood plain as determined by the Illinois Department of Transportation."

At the hearing before the Committee conducted on April 21, 1988, the assistant State's Attorney stated the reference to Illinois Department of Transportation had been removed from the statute. Several witnesses testified as to the approximate boundaries of the flood plain in relation to sites 3 and 4. There was some disagreement as to the present boundaries of the 100-year flood plain. However, there was general agreement that the current flood plain would have to be determined in a new topographical study. Such a study was underway at the time of the County Board proceedings.

On this subject, the County Board first heard from Paul McChancy, county planner with the Macon County Planning and Zoning Department. McChancy had prepared two maps based upon the FEMA maps. These maps were identical except for scale and were identified in the record as County Board exhibit Nos. 3 and 4. These maps, McChancy testified, are relied upon by his department and by developers in the county.

Based on exhibit No. 3, McChancy indicated the flood plain level in the general area of the landfill ranges from 599 to 600 feet above mean sea level. He estimated the flood plain level in the immediate vicinity of the proposed expansion area to be 599.25 feet above mean sea level. He stated, however, he did not know "how much the elevation is below 100 year flood plain at the south edge of the proposed landfill." He did, at MCL's request, mark County Board exhibit No. 3 to indicate the southernmost boundary of the area, 1,400 feet from the center of Hill Road, the north boundary line of the property. He testified that he had also marked on the map the flood plain level at the west boundary of the proposed expansion of the landfill. Using these markings, he then indicated that the difference (*i.e.*, the portion of the area overlapped by the flood plain) at that point is 210 feet. Under cross-examination, he estimated the amount of acreage within the proposed site, which is actually in the flood plain as he had drawn it, to be seven acres. He acknowledged that his mapping only represented where the flood plain lay as of 1984 and that the contours of the flood plain as shown on the map could vary 50 to 100 feet.

McKinney testified he agreed with McChancy's characterization of the FEMA map as relatively inaccurate and that it could vary between 50 and 100 feet. On cross-examination, McKinney testified based on personal knowledge that the actual flood plain is located

"right along the 1400 foot line," that is, the southern boundary of the site. He indicated he based his conclusion on a review of an aerial map prepared by one of MCL's former engineers from a 1970 aerial photograph, updated in 1977 by an MCL ground crew. He acknowledged, however, conditions of water flow and change in soil surface could require a change in the flood plain map from time to time.

Kugler testified the current landfill permit required the facility be located outside the estimated 100-year flood plain of 599.25 feet. Utilizing another map, he indicated that the current developmental permit allows the applicant to start its berm construction no lower than 600 feet above mean sea level. He affirmed that the berm which is to be constructed prior to commencement of landfilling operations must be constructed above the 100-year flood plain. The significance of this, he explained, is that the berm serves as an outside "initial barrier," diverting surface water runoff and allowing the landfill operator to establish exactly where his fill boundaries are. The berm is constructed of "clay soil compacted to meet the IEPA requirements of '10 to the -7 centimeters per second.'" He concluded that with the berm there will be no filling within the 100-year flood plain, although he acknowledged that a portion of the legal description for the overall site, not including the fill area, lay within the flood plain. He indicated that a new aerial survey was in progress in order to accurately delineate the current 100-year flood plain.

Dill authored a letter dated April 13, 1988, to the president of the Macon County Board. Under cross-examination, Dill referred to his statement in the letter to the effect that an engineering analysis of the 100-year flood plain would be required. Alluding to the topographical survey in progress, he stated that such data would not be needed until the developmental and operational stage. He specifically indicated that such data was not needed at the present time, during deliberations by the county. He joined Kugler in asserting that the berm at the southern end of the landfill would not be within the 100-year flood plain.

Thompson, based on his review of the exhibits then in the record, stated his conclusion that these documents failed to specify the exact locations of the monitoring wells. Based on his review of other IEPA documents for the site, he stated it appears three of the monitoring wells for sites 3 and 4 of the landfill would be located within the flood plain of the Sangamon River. He indicated that having these wells "submerged under water" in a flood would be undesirable.

Tate, based on his 30 years of living and farming in the area, described the general area as flooding frequently. He stated, "I don't

know anything about a 100-year flood plain, but I do know where the river floods because I have seen it time and time and time again." He indicated on County Board exhibit No. 5 the extent of the highest flooding he has experienced. He testified that this point was "probably 1,500 feet" from Hill Road.

The first issues to consider are whether MCL's failure to file with the application to the County Board for site-approval copies of all documents previously filed with the IEPA is a jurisdictional defect and whether the failure to include a precise description of the proposed site with regard to flood plain location, height expansion and special waste activity are jurisdictional defects. The jurisdictional issues center on the interpretation and application of subsections 39.2(b) and (c) of the Act. Section 39(c) vests in the County Board the power to approve the site-location suitability for new regional pollution control facilities. (Ill. Rev. Stat. 1987, ch. 111½, par. 1039(c).) Section 39.2(b) states:

"No later than 14 days prior to a request for location approval the applicant shall cause written notice of such request to be served either in person or by registered mail, return receipt requested, on the owners of all property within the subject area not solely owned by the applicant, and on the owners of all property within 250 feet in each direction of the lot line of the subject property, said owners being such persons or entities which appear from the authentic tax records of the County in which such facility is to be located; provided, that the number of all feet occupied by all public roads, streets, alleys and other public ways shall be excluded in computing the 250 feet requirement; provided further, that in no event shall this requirement exceed 400 feet, including public streets, alleys and other public ways.

Such written notice shall also be served upon members of the General Assembly from the legislative district in which the proposed facility is located and shall be published in a newspaper of general circulation published in the county in which the site is located. Such notice shall state the name and address of the applicant, the location of the proposed site, the nature and size of the development, the nature of the activity proposed, the probable life of the proposed activity, the date when the request for site approval will be submitted to the county board, and a description of the right of persons to comment on such request as hereafter provided." (Ill. Rev. Stat. 1987, ch. 111½, par. 1039.2(b).)

The subsection has been determined to be jurisdictional so that even a one-day deviation in the 14-day notice requirement renders the County Board without jurisdiction to consider the request. *Browning-Ferris Industries of Illinois, Inc. v. Pollution Control Board* (1987), 162 Ill. App. 3d 801, 516 N.E.2d 804; *Concerned Boone Citizens, Inc. v. M.I.G. Investments, Inc.* (1986), 144 Ill. App. 3d 334, 494 N.E.2d 180; *Kane County Defenders, Inc. v. Pollution Control Board* (1985), 139 Ill. App. 3d 588, 487 N.E.2d 743.

Section 39.2(c), prior to July 1, 1988, read as follows:

"An applicant shall file a copy of its request, accompanied by all documents submitted as of that date to the Agency in connection with its application except trade secrets as determined under Section 7.1 of this Act, with the county board of the county or the governing body of the municipality in which the proposed site is located. Such copy shall be made available for public inspection at the office of the county board or the governing body of the municipality and may be copied upon payment of the actual cost of reproduction.

Any person may file written comment with the county board or governing body of the municipality concerning the appropriateness of the proposed site for its intended purpose. The county board or governing body of the municipality shall consider any comment received or post-marked not later than 30 days after the date of the last public hearing." (Ill. Rev. Stat. 1987, ch. 111½, par. 1039.2(c).)

After being amended by Public Act 85—945, effective July 1, 1988 (1987 Ill. Laws 4112, 4113), section 39.2(c) now reads as follows:

"(c) An applicant shall file a copy of its request with the county board of the county or the governing body of the municipality in which the proposed site is located. The request shall include (i) the substance of the applicant's proposal and (ii) all documents, if any, submitted as of that date to the Agency pertaining to the proposed facility, except trade secrets as determined under Section 7.1 of this Act. All such documents or other materials on file with the county board or governing body of the municipality shall be made available for public inspection at the office of the county board or the governing body of the municipality and may be copied upon payment of the actual cost of reproduction.

Any person may file written comment with the county board or governing body of the municipality concerning the appropriateness of the proposed site for its intended purpose. The

county board or governing body of the municipality shall consider any comment received or post-marked not later than 30 days after the date of the last public hearing." Ill. Rev. Stat. 1987, ch. 111½, par. 1039.2(c).

Petitioners contend the failure of MCL to file all technical documents then on file with the IEPA concerning the site along with the request for expanded site approval divested the County Board of jurisdiction. The County Board and IPCB strictly construed the statute as it existed at the time of the hearing to require MCL to file documents which it had filed with the IEPA relating to the application for site approval. Since the documents on file with the IEPA had been filed for a different purpose, the County Board and IPCB decided the documents need not be filed with MCL's request.

██ County Board concedes that under the statute, as amended effective July 1, 1988, the documents on file with the IEPA would be required to be filed with the request, but argues that petitioners are asking this court to retroactively apply the amended statute. Petitioners' reply brief suggests the County Board's argument is a smoke screen, pointing out that petitioners' argument does not refer to the amendment. While the contention that petitioners seek a retroactive application of the amendment seems meritless, there is some merit to the argument the amendment evidences a change in legislative intent. (See *In re Estate of Zimmerman* (1978), 63 Ill. App. 3d 560, 380 N.E.2d 434.) This reinforces the IPCB's finding that, prior to July 1, 1988, a request for site expansion need only be accompanied by documents on file with the IEPA in connection with the site expansion applications and not documents which have otherwise been filed with the IEPA.

Having decided that the statute did not require the filing of the documents as petitioners suggest, this court need not consider whether subsection (c) of section 39.2 is jurisdictional. Merely because subsection (b) has been held to be jurisdictional does not necessarily mean that compliance with subsection (c) also must be had before the County Board has jurisdiction. It is possible the legislature intended subsection (c) to provide a procedural requirement similar to the statute requiring that a copy of a written instrument be appended to a complaint filed in the circuit court for any cause of action allegedly based on said written instrument. See Ill. Rev. Stat. 1987, ch. 110, par. 2—606.

██ Although it seems clear that the amendment to subsection (c) corrects this problem for all future applications, there remains, nevertheless, the consideration of whether the failure to provide the doc-

uments at an early stage in the proceedings deprived the petitioners of a fundamentally fair process. This is a matter of considerable concern to this court because the better practice would certainly have been for the County Board to require MCL to produce copies of the documents for petitioners' counsel. On the other hand, the record clearly indicates that these documents pertain not to the expansion of the site but to the application to the IEPA for a developmental permit filed years before the instant application, that the documents were on file with the IEPA and were public record, and that the Committee held several hearings after the documents became available to petitioners so that petitioners' witnesses certainly had an opportunity to review the documents before testifying. Since petitioners have failed to demonstrate how they have been prejudiced by MCL's failure to file the documents with the original application or the failure to produce copies of the documents at an early stage in the proceedings, any error which may have occurred is harmless at best. In future, similar proceedings, however, county boards should be aware that the failure to honor a request to produce documents could jeopardize the fundamental fairness of the proceedings.

■■ Without citing any case authority, petitioners suggest that if MCL was not required to file the documents with the request, the documents were irrelevant and should not have been accepted into evidence. We disagree. While these documents may not have been filed with the IEPA in connection with the application for site approval, the documents may nevertheless be pertinent to the factors listed in section 39.2(a), which must be considered before approval of the request. In fact, there may be any number of documents which have never been filed with the IEPA which are relevant to the proceedings.

■■ The final contention of petitioners concerning jurisdiction is that MCL's request failed to invoke the jurisdiction of the County Board because the request did not include a precise description of the proposed expansion. Specifically, petitioners complain the request did not accurately describe the flood plain location, height expansion, or the special waste activity. Petitioners' argument is that if the purpose of the 14-day notice provision is to encourage public comment, this court should not allow the purpose to be defeated by the failure to adequately describe the site since the public would be unaware of the nature of the activity and could not therefore comment on it.

Petitioners, however, cite no authority for the proposition that a flood plain description, a description of size of the vertical expansion, or a description of special waste activity be included in the request.

Section 39.2(b) includes the requirement that the notice state the applicant's name and address, the location of the proposed site, the nature and size of the development, the nature and probable life of the proposed activity, the date the request will be submitted to the County Board, and a description of the rights of persons to comment on the request as provided by statute.

Petitioners contend the admission that the legal description of the landfill site was not accurate and that a portion of the site as legally described is within the 100-year flood plain renders the notice inaccurate. Petitioners also argue that since a vertical height expansion is considered a new regional pollution control facility requiring compliance with section 39.2 (*M.I.G. Investments, Inc. v. Environmental Protection Agency* (1988), 122 Ill. 2d 392, 523 N.E.2d 1), the notice should have described the size of the expanded facility in terms of vertical expansion. In addition, the activity of accepting special wastes should have been mentioned in the notice. All of these, according to petitioners, are jurisdictional defects.

On this point, the County Board's brief merely indicates that at the time of the notices being issued, an appellate court had determined that vertical extension of an existing site was not a new regional pollution control facility under the Act. (*M.I.G. Investments, Inc. v. Environmental Protection Agency* (1986), 151 Ill. App. 3d 488, 502 N.E.2d 1042.) The decision was reversed by the supreme court, as noted earlier, on April 25, 1988, after the issuance of the notices. However, considering that no other proceedings had yet taken place, this does not seem to be a reasonable excuse for not requiring the issuance of a new notice if the existing notices were indeed defective.

MCL suggests the petitioners failed to raise the question concerning description of vertical expansion and special waste before the County Board and IPCB and, therefore, have waived these arguments for purposes of appeal. However, if petitioners are correct and the failure to include these items in the notice is a jurisdictional defect, perhaps waiver is avoided. An objection to jurisdiction may be interposed at any time according to *Concerned Boone Citizens, Inc. v. M.I.G. Investments, Inc.* (1986), 144 Ill. App. 3d 334, 494 N.E.2d 180.

In *Daubs Landfill, Inc. v. Pollution Control Board* (1988), 166 Ill. App. 3d 778, 520 N.E.2d 977, the court discussed the sufficiency of a legal description contained in the notice. The court found that the narrative description was adequate to apprise the reader of the location of the site, and even though the legal description was so in-

accurate that it placed the site six miles from the site identified in the narrative description, the court determined this was such an obvious discrepancy that no confusion should result. Furthermore, the notice provision does not specifically require a legal description.

As for the flood plain, this is a very precise, technical matter. This is very similar to the question concerning the legal description in *Daubs*. In this case, the request refers to the site being outside the 100-year flood plain. The legislature required the county to consider whether the facility is within the 100-year flood plain. (Ill. Rev. Stat. 1987, ch. 111½, par. 1039.2(a)(iv).) Had the legislature intended to require a precise statement in the notice as to the location of the flood plain, we would reasonably expect the legislature to say so.

The purpose of the notice is obviously to notify interested persons of the intent to seek approval to develop a new site or to expand an existing facility. The notice is sufficient if it is in compliance with the statute and it places potentially interested persons on inquiry about the details of the activity. The notice itself need not be so technically detailed as to raise unnecessary concerns among local residents and the general public. Clearly, the statute does not require the notice to be so technical that only an engineer would understand it. Therefore, the notice in the case at bar was sufficiently in compliance with the statute to vest the County Board with jurisdiction and was also sufficient to notify potentially interested parties that some new activity was being proposed for the site as to enable inquiries to be made.

■ The next issue to consider is whether it was fundamentally unfair for the IPCB to deny petitioners' offer of proof that a Clinton landfill located within 15 miles had obtained local siting approval for special waste with a 50-year capacity. Although citizens before the County Board in such proceedings as these are not entitled to a fair hearing by reason of the constitutional guarantees of due process, they may insist the procedure comport with standards of fundamental fairness. *E & E Hauling, Inc. v. Pollution Control Board* (1983), 116 Ill. App. 3d 586, 451 N.E.2d 555.

■ In response to petitioners' contentions, MCL notes that the IPCB concluded the County Board could have approved the site even if the offer of proof had been accepted. Furthermore, there was no evidence of how much waste, if any, the Clinton landfill would have accepted from Macon County.

Since the IEPA had not yet approved the Clinton landfill site and therefore the 50-year capacity was not a fact, but merely an expectancy, the IPCB decided that such capacity should not be considered

in determining whether the area needs the MCL expansion. Recently, the question of whether the capacity of facilities outside the county could be considered was discussed in *Waste Management of Illinois, Inc. v. Pollution Control Board* (1988), 175 Ill. App. 3d 1023, 1032, 530 N.E.2d 682, 690:

> "It is not improper to consider facilities outside of the intended service area if those facilities are presently providing waste disposal to the county. Neither would it be inappropriate to consider proposed facilities, whether in or out of the county, if such facilities will be capable of handling a portion of the waste disposal needs of the county and will be capable of doing so prior to the projected expiration of current disposal capabilities within the county such that the needs of the county will continue to be served."

Since the offer of proof does not demonstrate that the landfill in Clinton is presently providing services to Macon County or will be capable of handling a portion of the needs of Macon County, the refusal of the offer of proof was not a denial of fundamental fairness to the petitioners.

The remaining contentions concern the sufficiency of the evidence. Several contentions are raised by petitioners: (1) the County Board and IPCB failed to conclusively determine whether the facility is located outside the 100-year flood plain or is flood-proofed as required by section 39.2(a)(iv) and any such determination would be against the manifest weight of the evidence in any event; (2) the evidence fails to adequately address the safety design factor and therefore the decision of the County Board is against the manifest weight of the evidence; (3) in considering the safety design factor, the IPCB majority improperly considered as evidence the favorable experience of the existing facility; (4) the decision of the County Board is against the manifest weight because the evidence does not establish a plan to minimize incompatibility of the facility to the public previously as to visual screening of the facility from neighboring real estate as well as control of rats, odor, birds, litter, dust, and noise; (5) the decision of the County Board is against the manifest weight of the evidence because there is no evidence of a plan to adjust traffic pattern to accommodate expected increased traffic; and (6) the decision of the County Board is against the manifest weight because the evidence does not establish a need for the expanded facility.

Section 39.2(a) of the Act (Ill. Rev. Stat. 1987, ch. 111½, par. 1039.2(a)) states:

> "The county board of the county or the governing body of

the municipality, as determined by paragraph (c) of Section 39 of this Act, shall approve the site-location suitability of a new regional pollution control facility only if the facility meets the following criteria:

(i) the facility is necessary to accommodate the waste needs of the area it is intended to serve;

(ii) the facility is so designed, located and proposed to be operated that the public health, safety and welfare will be protected;

(iii) the facility is located so as to minimize incompatibility with the character of the surrounding area and to minimize the effect on the value of the surrounding property;

(iv) the facility is located outside the boundary of the 100 year flood plain or the site is flood-proofed;

(v) the plan of operations for the facility is designed to minimize the danger to the surrounding area from fire, spills, or other operational accidents;

(vi) the traffic patterns to or from the facility are so designed as to minimize the impact on existing traffic flows;

(vii) if the facility will be treating, storing or disposing of hazardous waste, an emergency response plan exists for the facility which includes notification, containment and evacuation procedures to be used in case of an accidental release; and

(viii) if the facility will be located within a regulated recharge area, any applicable requirements specified by the Board for such areas have been met."

The resolution of the County Board concluded:

"NOW, THEREFORE, BE IT RESOLVED by the Macon County Board that they hereby concur with the recommendation of the Landfill Siting Committee that Macon County Landfill, Inc., be issued a permit for handling special non-hazardous waste and the right to increase the elevation to 695 MSL [mean sea level], with the understanding that the five (5) outlined stipulations must be adhered to upon the issuance of said permit."

The stipulation or conditions outlined in the resolution are these:

"(1) That monitoring wells be increased in density to three (3) upstream, and six (6) downstream, and that they go to a minimum of 15 feet below the bottom of the proposed landfill, or go to a depth of 5 feet into the water bearing formation, whichever is greater.

(2) That a 10 foot clay liner be placed under and on the

sides of the landfill sites compacted to a 10 to the minus 7 compaction. (Note: Current site does not have clay liner or liner of any kind!)

(3) That the existing pipeline be relocated and the easement vacated.

(4) That the existing pipeline be removed.

(5) That the entire landfill area be out of flood plain or be flood-proofed."

The criteria which petitioners claim have not been established by the manifest weight of the evidence are subsections (i), (ii), (iii), (iv), and (vi) of section 39.2(a). As noted earlier, the dissenting IPCB members were concerned with the failure of MCL to show the site was designed safely (subsection (ii)), or to demonstrate any plans to minimize the incompatibility with surrounding property (subsection (iii)).

■ *Waste Management of Illinois, Inc. v. Pollution Control Board* (1987), 160 Ill. App. 3d 434, 513 N.E.2d 592, decided that all of the statutory criteria must be satisfied in order for approval and that the proper standard of review for the County Board's decision is whether the decision is against the manifest weight of the evidence, with the manifest weight standard being applied to each and every criterion. See also *City of Rockford v. Pollution Control Board* (1984), 125 Ill. App. 3d 384, 465 N.E.2d 996.

A decision is against the manifest weight of the evidence if the opposite result is clearly evident, plain, or indisputable from a review of the evidence. (*Harris v. Day* (1983), 115 Ill. App. 3d 762, 451 N.E.2d 262.) The province of the hearing body is to weigh the evidence, resolve conflicts in testimony, and assess the credibility of the witnesses. A reviewing court is not in a position to reweigh the evidence, but can merely determine if the decision is against the manifest weight of the evidence. *Jackson v. Board of Review of the Department of Labor* (1985), 105 Ill. 2d 501, 475 N.E.2d 879; *McKey & Poague, Inc. v. Stackler* (1978), 63 Ill. App. 3d 142, 379 N.E.2d 1198.

In *County of Lake v. Pollution Control Board* (1983), 120 Ill. App. 3d 89, 457 N.E.2d 1309, the court discussed the relative authority of the County Board, IPCB, and IEPA with regard to conditions placed on a location site approved by a County Board. In this case, the authority of the County Board to impose conditions is not challenged. Instead it is the wisdom of conditioning approval on compliance by MCL instead of requiring proof of compliance in advance which is challenged.

■ On the issue of the 100-year flood plain (subsection (iv)), the

County Board and IPCB were satisfied with the assurances that MCL would not expand into the flood plain once the location of the flood plain is determined. The County Board made this a condition of site approval, and required that if MCL expands into the flood plain, the site be flood proofed. Furthermore, Tate testified flooding generally reached as close as 1,500 feet from Hill Road, while the testimony was that the berm would be constructed 1,400 feet from Hill Road.

Based on the assurance that MCL would not expand into the flood plain, it is ridiculous to demand proof of a design for flood proofing the site. If MCL violates the condition, the county can enforce it as discussed in the *County of Lake* decision. Moreover, the IEPA has yet to approve the expansion of this facility and a study of the location of the flood plain is in progress.

Petitioners complain that the exact location of the flood plain must first be determined before the County Board can grant approval. Interestingly, the dissenting members of the IPCB do not refer to this issue as a basis for disagreement with the majority. And since, wherever the flood plain is found to be, MCL is not going to expand into the flood plain, we too do not find this to be a reasonable basis for overturning the decision of the County Board and IPCB.

■ The criterion of whether a facility is necessary to accommodate the area's needs (subsection (i)) was discussed in *Waste Management of Illinois, Inc. v. Pollution Control Board* (1988), 175 Ill. App. 3d 1023, 530 N.E.2d 682. An absolute necessity need not be shown, but an urgent need together with the reasonable convenience of expanding the facility must be demonstrated. The court added:

> "Neither the Act nor case law suggests that need be determined by application of an arbitrary standard of life expectancy of existing disposal capacities. The better approach is to provide for consideration of other relevant factors such as future development of other disposal sites, projected changes in amounts of refuse generation within the service area, and expansion of current facilities." *Waste Management*, 175 Ill. App. 3d at 1033-34, 530 N.E.2d at 691.

■ In the case at bar, there was no evidence of future development or projected changes in refuse generation in the area. There was, however, indication that in a relatively short time local facilities would not be able to facilitate the present level of waste generated in the area. As earlier noted, petitioners attempted to have the County Board consider a facility located at Clinton, Illinois, even

though the expansion of that facility had not yet been approved by the IEPA and without offering evidence that the Clinton facility accepted waste from Macon County. The County Board properly refused to consider this offer of proof.

The County Board could reasonably find a need for the expansion of this facility. There was no dissent among members of the IPCB on this criterion either.

Minimization of the impact of traffic flow (subsection (vi)) is another criterion in which there was no disagreement among members of the IPCB. Petitioners admit that no case law defines the "traffic plan criterion," but they contend MCL should be required to place into evidence before the County Board designs for exact routes, types of traffic, and projections of volume and hours of traffic.

However, the statute does not talk about a "traffic plan." Instead, the Act talks about traffic patterns to and from the facility being designed to minimize impact on existing traffic flow.

There was testimony of the existing traffic patterns and the fact there had been little, if any, problems. Roger Tate testified about traffic noise from morning to dark, and dust. This testimony does not relate to the effect on traffic flow. He did, however, testify that traffic patterns are constantly changing and that truck drivers do not seem to pay much attention to the smaller vehicles.

Potential negligence of the truck drivers is not the issue. And the existing flow of traffic into the existing facility is part of the *existing* traffic flow. The IPCB found ample evidence that traffic patterns are designed to minimize impact on traffic flow, citing evidence of truck routes, road condition, and usage, location of the access gate and the MCL plan to extend the on-site exit roadway to minimize road mud.

The operative word in the statute seems to be "minimize." It is impossible to eliminate all problems. If only a few persons complain of the traffic, it would seem the impact is minimized. Petitioners presented no evidence of how the traffic flow to the expanded facility would negatively impact existing traffic flow or how the traffic flow should be changed as had been done in *McHenry County Landfill, Inc. v. Environmental Protection Agency* (1987), 154 Ill. App. 3d 89, 506 N.E.2d 372.

It is the two remaining criteria which concern the dissenting members of the IPCB: the facility is designed, located, and proposed to be operated so that the public health, safety, and welfare will be protected (subsection (ii)); and the facility is located so as to minimize

incompatibility with the character of the surrounding area and to minimize the effect on the value of the surrounding property (subsection (iii)).

The *McHenry County Landfill* case indicates that a County Board may reject a site if the County Board determines the proposed facility presents a potential health hazard to the community even though compliance with all technical requirements of the IEPA and IPCB was had.

In *City of Rockford v. Pollution Control Board* (1984), 125 Ill. App. 3d 384, 465 N.E.2d 996, the court reviewed the type of evidence relevant to the consideration of the public safety criterion. Compared to the *City of Rockford* case, the evidence of the design for public safety is not as voluminous in this case. On the other hand, this case does not involve hazardous waste as did *City of Rockford*. The County Board did condition approval of the site on removal of a gas pipeline and placement of a lining. The IPCB majority relied on "many years of generally favorable experience with the existing MCL landfilling operation in Macon County."

We do not read, as do petitioners, that the word "design" in the statute requires the submission of some formal written document anticipating and addressing any objections which might be raised. Based on the evidence before the County Board and the IPCB, we are not convinced that the opposite conclusion is clearly evident.

The case of *Waste Management of Illinois, Inc. v. Pollution Control Board* (1984), 123 Ill. App. 3d 1075, 463 N.E.2d 969, discussed the type of evidence which might appropriately be considered with reference to minimizing the impact of the proposed facility to the surrounding area. However, it is logical to require this evidence to be presented only if there is indeed some incompatibility with the surrounding area shown to exist.

We are mindful that on only one side of the facility is there a residential area with which there may be some incompatibility. In addition, this case involves the vertical expansion of an existing facility for which developmental permits have already been issued. While a pile of garbage is unsightly and unappealing to most people, MCL already has permission to utilize the facility. In addition, MCL currently accepts special waste on another portion of the same facility.

There is no evidence in this case that the proposed expansion will have a deleterious effect on public health, safety, welfare, or the property values of surrounding property. It is all speculative. There is some concern that a tree line screening the facility will be removed if the gas pipeline is moved to that side of the MCL property.

Since the developmental permit was issued, the gas pipeline has to be moved whether or not the expansion is allowed. Moreover, it is merely speculative, at this point, to consider the possibility of moving a pipeline that may merely be abandoned instead. All the evidence establishes is that there can be no pipeline running through the center of the facility. And there is no evidence that petitioners are prevented in some way from planting vegetation for screening on their own property so that the screening vegetation would be under petitioners' control.

Thelma Reed complained the water from her faucet became dirty after MCL began working in the expanded site. There is no evidence this is a permanent situation rather than a merely temporary phenomenon, nor is there any conclusive evidence that the dirty water was caused by MCL activity. No tests were conducted on Reed's water as had been on Tate's.

Experts testified for petitioners, for MCL, and for the County Board. The credibility to be accorded the testimony of these witnesses is a matter to be determined by the hearing tribunal, not the reviewing court. Merely because there is some evidence which, if accepted, would have supported a contrary conclusion, does not mean that this court will substitute its judgment for that of the County Board or the IPCB. After a review of the evidence, the opposite conclusion from that reached by the County Board and the IPCB is not clearly evident. Although this court fully understands the petitioners' concerns, we cannot say the decisions of the administrative bodies are against the manifest weight of the evidence. While our understanding may be of little solace to petitioners, we note that this decision by no means concludes this matter since the IEPA still has to approve the expansion as well as issue an operating permit on the original application. In addition, the IEPA has ongoing authority to inspect and review MCL's activity at the facility.

For these reasons, the order of the IPCB affirming the decision of the Macon County Board is affirmed.

Affirmed.

LUND and STEIGMANN, JJ., concur.