INDUSTRIAL FUELS AND RESOURCES/ILLINOIS, INC., Petitioner-Appellant, v. THE POLLUTION CONTROL BOARD *et al.,* Respondents-Appellees.

First District (4th Division)   No. 1—91—0144

Opinion filed March 19, 1992.

534

W. Robert Blair, of Chicago, for petitioner.

Roland W. Burris, Attorney General, of Springfield (Rosalyn B. Kaplan, Solicitor General, of Chicago, of counsel), for respondent Pollution Control Board.

James D. Montgomery & Associates, of Chicago (James D. Montgomery, of counsel), for respondent City Council of City of Harvey.

JUSTICE LINN delivered the opinion of the court:

Industrial Fuels & Resources/Illinois, Inc. (Industrial), sought local siting approval from the City of Harvey for a new regional pollution control facility to be located within Harvey's municipal boundaries. Harvey denied approval based on its belief that Industrial had failed to satisfy certain statutory criteria under section 39.2 of the Illinois Environmental Protection Act (Act) (Ill. Rev. Stat. 1989, ch. 111½, par. 1039.2). Industrial appealed the decision to the Illinois Pollution Control Board (Board). The Board affirmed Harvey's denial with respect to four of the disputed criteria and reversed with respect to one. Industrial unsuccessfully moved the Board to reconsider its decision and then filed its petition to this court, pursuant to section 41 of the Act (Ill. Rev. Stat. 1989, ch. 111½, par. 1041) and Supreme Court Rule 335 (134 Ill. 2d R. 335).

We reverse.

BACKGROUND

In August 1989 Industrial submitted its request to Harvey for local siting approval of a new regional pollution control facility to be located in a vacant parcel in an area that is zoned for light manufacturing. Industrial was required under the Act to obtain siting approval before the Illinois Environmental Protection Agency issued any permits. Ill. Rev. Stat. 1989, ch. 111½, pars. 1039.2, 1039(c).

The proposed facility would be constructed and operated on approximately 13½ fenced acres, with four structures totalling 65,000 square feet, plus liquid storage tanks. The life of the facility would be at least 30 years.

The facility would blend solid and liquid organic wastes as well as solvents, which would be extracted from contaminated soils, all for off-site secondary fuel uses. The facility would also incinerate medical wastes and dispose of the residue off-site. The intended service area of the facility includes Illinois, Indiana, Wisconsin, Michigan, Minnesota, and Ohio.

Public hearings were held in accordance with the Act and evidence was taken. In addition, several members of the public commented upon or questioned Industrial and Harvey about the proposal.

Harvey commissioned its own review of the siting proposal and requested an environmental impact statement from a consulting engineering firm, STV/Seelye Stevenson Value & Knecht (STV). STV recommended that Harvey consider approving the siting with certain conditions.

Section 39.2(a) of the Act sets out criteria for siting approval:

"[1] the facility is necessary to accommodate the waste needs of the area it is intended to serve;

[2] the facility is so designed, located and proposed to be operated that the public health, safety and welfare will be protected;

[3] the facility is located so as to minimize incompatibility with the character of the surrounding area and to minimize the effect on the value of the surrounding property;

[4] the facility is located outside the boundary of the 100 year flood plain or the site is flood-proofed;

[5] the plan of operations for the facility is designed to minimize the danger to the surrounding area from fire, spills, or other operational accidents;

[6] the traffic patterns to or from the facility are so designed as to minimize the impact on existing traffic flows;

[7] if the facility will be treating, storing or disposing of hazardous waste, an emergency response plan exists for the facility which includes notification, containment and evacuation procedures to be used in case of an accidental release;

[8] if the facility is to be located in a county where the county board has adopted a solid waste management plan, the facility is consistent with that plan; and

[9] if the facility will be located within a regulated recharge area, any applicable requirements specified by the Board for such areas have been met." Ill. Rev. Stat. 1989, ch. 111½, par. 1039.2(a).

Harvey took the position that Industrial had failed to meet its burden of proof as to criteria 1, 2, 5, 6, and 7. The Board upheld the decision as to all but criterion 6.

THE EVIDENTIARY HEARING ON SITING APPROVAL

CRITERION 1—NECESSITY

Edward H. Prium, the president of Industrial, testified as to his experience with similar facilities owned by Industrial in Indiana and Missouri. Industrial retained Andrews Environmental Engineering, Inc., to prepare the siting request application and Prium reviewed it. He was familiar with the various State and Federal laws and regulations governing processing and disposal of wastes. In his business judgment, the facility is necessary. He stated that the cost would be $15 million and that 100 to 125 jobs would be created.

J. Douglas Andrews, who prepared the request for site approval, specializes in environmental engineering. He was formerly a division manager for the Illinois Environmental Protection Agency, responsible for statewide control of waste management sites under the Act. He testified that his company, Andrews Environmental Engineering, Inc., has designed more than 50 sanitary landfills, 10 transfer stations, recycling operations, waste site remediation, and other waste management facilities.

Andrews described the general operations and capabilities of the proposed facility. He testified that the waste streams to be served were organic wastes for fuel blending, contaminated soils, and medical wastes. On the basis of the data obtained from regulatory agencies and industry associations, Andrews believed that even after the proposed Harvey site would be in operation the waste needs of the area would not be fully met. He also found, based on recently adopted and effective laws and regulations regarding waste processing and disposal, that the need for the services provided by the proposed facility is substantial and growing.

Andrews concluded that in light of all the data he reviewed, as well as his education, professional training, and experience, the proposed facility is necessary to serve the waste needs of the area.

CRITERION 2—PROTECTION OF PUBLIC HEALTH, SAFETY AND WELFARE

J. Douglas Andrews testified that the facility is designed in accordance with all governmental requirements. To ensure even greater safety, the facility also incorporates the recommendations of a fire safety design and review plan prepared by safety consulting engineer C. James Dahn.

Andrews testified regarding the procedures and features that would contain or prevent fires. The fire suppression system would be matched to the type of fire that might occur and the specific location of such a fire. There would be an alarm and sprinkler system, and the employees of the facility would be given safety training and tested for proficiency in the use of safety equipment and emergency procedures. Fire hydrants are adjacent to the site, which is located close to fire, medical, and police services, and all necessary utilities are available, including water, sanitary sewer, storm sewers, natural gas, and electricity. Andrews also testified that the plan of operations for the facility is based on those in use at Industrial's fuel-blending plants in South Bend, Indiana, and Scott, Missouri.

Before the facility is permitted to begin operations, it must be demonstrated to all controlling regulatory agencies that the facility is

in compliance with all pertinent laws and that no violations of ordinances, regulations, or other legislation will occur as a result of operations. The plan also provides for the closure of the facility at the end of its useful life and for clean-up operations upon closure.

Andrews also testified regarding the medical waste incineration procedures and safety precautions, which include an automatic shutdown capability if operating conditions vary from normal. No radioactive wastes or highly toxic materials will be accepted at the facility. All drivers of delivery vehicles will receive instruction regarding applicable safety procedures. On the basis of his background and experience, and the facts set forth in the request for site approval, Andrews testified that in his opinion, the facility is so designed, located, and proposed to be operated that the public health, safety, and welfare will be protected.

C. James Dahn, the safety consulting engineer, testified that his business is to conduct safety analyses and testing of new processes and chemical processing plants for both private industry and the Federal government. A registered professional engineer certified in chemical engineering, Dahn is employed by Safety Consulting Engineering, Inc. He belongs to several professional societies or associations, including the National Fire Protection Association. At the request of Andrews Environmental Engineering, Safety Consulting performed a fire safety design and review of Industrial's proposed facility in Harvey. Dahn reviewed the layout of the facility and its plan of operations, along with his analysis of fire safety criteria, and all relevant data in the request for site approval. He concluded that the facility is designed, located, and proposed to be operated in such a way as to protect the public health, safety, and welfare.

John Basic, a registered professional engineer, testified that he is the founder and president of Basic Environmental engineering, which designs and builds incinerator systems for institutional, municipal, industrial, and commercial uses. His company has received several awards for its efforts to advance state-of-the-art technology in pollution control.

Basic testified that Industrial engaged his company to design and construct the medical waste incinerator at the facility. The design, drawings, and patents for the system to be installed are found in a 202-page exhibit. The medical waste incineration system his company has designed differs from others in use currently because it incorporates multistage, state-of-the-art technology that allows incineration to take place in a controlled manner. The resulting residue is a fine powder which is not released into the surrounding area but instead is

captured by a fabric filter that can prevent the escape of particles as small as three tenths of a micron. The system protects the environment and solves the problem of converting waste to energy through the use of a new waste destruction technology coupled with efficient energy recovery.

Basic further testified that his company has constructed similar incinerator systems for operation at Mercy Hospital in Chicago and Erlanger Medical Center in Chattanooga, Tennessee, both of which have been operating since 1982. His company has also constructed and placed systems in hospitals in Florida, Evanston, and Taiwan. In addition, his company has completed a large commercial unit for Midway Environmental Management in Stroud, Oklahoma. Federal and State regulatory agencies in Oklahoma have verified through testing that the Basic system installed there not only meets their requirements but exceeds them substantially. For example, the required removal of particulate matter in Oklahoma is 70%, and the Basic system removes 98%. The Basic system averages not more than two parts carbon monoxide per million, while the required level is not more than 50 parts per million.

Basic testified that the same system levels as are in operation in Oklahoma will be met by the incinerator proposed for the Harvey site. In his opinion, the facility will be built in a manner that protects the public health, safety, and welfare.

David Jordan, operations manager for Industrial at the Missouri site, testified that he is familiar with all of Industrial's operations and that the proposed site in Harvey would be substantially similar to Industrial's other sites and will protect the public health, safety, and welfare.

James Kuipers, president of Industrial in Indiana, testified regarding the process of contaminated soil remediation. Contaminated soils will be processed through a safe, microwave technology that takes place in a stainless steel microwave oven that is completely enclosed and releases nothing to the environment.

Additional evidence on criterion 2 was taken from the STV engineering report that was prepared at Harvey's request. Although the report states that the nearest occupied dwellings are only 700 feet away and that a significant number of residents live within one mile of the proposed facility, it also acknowledges that the facility will have a positive socio-economic impact. Jobs will be created and the local tax base expanded. The STV report indicates that accelerated storm water runoff and erosion is not expected to be a problem, nor is localized flooding expected to occur.

The STV report concludes that site preparation and construction activities and operations are not expected to dislocate wildlife species or increase silt and sediment loads in river tributaries. Solid waste will be processed and disposed of in an environmentally sound manner.

The STV report notes that although the facility will generate steady and intermittent noise, the impact of the noise is not considered significant considering the location and the fact that most noises will be inside buildings. Overall, the site is aesthetically unremarkable and the development is consistent with the nature of the surrounding area. In its current state, the vacant site is of little value to the community.

One concern of the STV report is the effect of the facility's operations upon groundwater, especially if an accidental spill onto area soils occurred. Groundwater is expected at depths of less than 20 feet and there are a number of industrial users of groundwater in the area. Provided that proper environmental safeguards are included in the design of the facilities, however, the impact on area surface waters would be minimal. There are several sources of air emission nearby the site and the area falls short of the national ambient air quality standards for ozone and particulates, although it meets the standards for nitrogen oxides, sulfur dioxide, and carbon monoxide.

CRITERION 5—MINIMIZATION OF DANGER FROM FIRE, SPILLS, OR OTHER OPERATIONAL ACCIDENTS

Andrews testified that the facility will be operated in strict compliance with all State, Federal, and local requirements, including fire codes and regulations, and that such safeguards exist to protect both the workers at the facility and the surrounding area. Industrial designed the facility to exceed the minimum requirements of governmental agencies. Areas where spills may occur have built-in containments. All vehicle operators will be trained in spill control and their vehicles will be outfitted with special equipment for controlling spills. The plan of operations for the facility provides for regular inspections of containers used in transport and the emergency transfer of the contents of such containers to a containment area should stress to a container result in leakage or spills. The plan incorporates several other safety features, such as a secondary containment system, continuous inspecting and testing of containers and tanks, and 24-hour surveillance of the facility by security guards who will be trained in emergency response procedures. The facility will be surrounded on all sides with a six-foot-high fence and warning signs will be prominently

posted. Access to the active portion of the facility will be restricted. Andrews also testified regarding safety procedures for removing decontaminated soils and other residuals to approved sanitary landfills or recycling centers. In his expert opinion, the plan of operations for the facility is designed to minimize the danger to the surrounding area from fire, spills, or other operational accidents.

Prium identified the licensed special waste hauler that would be used. This waste hauler, which has an excellent safety record, would be used to transport 90% of the waste materials to and from the facility.

Dahn testified that in his opinion, based on a review of the siting request in light of criterion 5, the plan of operations was designed to minimize operational hazards.

CRITERION 7—EMERGENCY RESPONSE PLAN IN THE EVENT OF ACCIDENTAL RELEASE OF HAZARDOUS MATERIAL

Andrews testified that the facility would be receiving, storing, and treating wastes that are ignitable and therefore classified as hazardous. He testified regarding the emergency plan that Industrial developed, including notification, containment, and evacuation procedures. According to him, the likelihood of an accidental release is remote because of the prevention measures that will be in effect, along with the site's location in an industrial rather than residential area.

The emergency response plan is similar to those in effect in Industrial's Indiana and Missouri plants. It calls for the plant manager as emergency coordinator or the assistant plant manager as assistant coordinator to implement the emergency procedures in the event of a fire, explosion, or release of hazardous waste that could threaten human health or the environment. The plan provides for immediate notification of a crisis through two primary modes—a two-way voice communication system which links the office with all areas where wastes are stored, processed, or hauled, and a secondary system, in the event of a power outage, which uses a timed sound blast to denote instruction to evacuate the premises and a double-timed blast to denote need for assistance. The plan also designates various safety features, such as a ventilation system; pressure release panels in containers; a water curtain to prevent spread of fire; a sprinkler system as well as fire extinguishers; training of personnel; and maintenance of emergency equipment.

The emergency response plan further provides that the facility will enter into "coordination agreements" with local fire and police departments for maximum effectiveness in the event of accidents.

Area hospitals and emergency response teams will be familiarized with the facility and given on-site visits.

The STV report prepared for Harvey, however, stated that STV was unable to recommend an unconditional siting approval because it did not have enough information on certain aspects of the project, such as the specifics for notification, containment, and evacuation procedures in the event of an emergency. The chief criticism of the STV report appears to be that the documents presented were "conceptual" in nature, with insufficiently detailed designs. Industrial provided additional material, which was admitted into evidence without objection or challenge. STV ultimately recommended site approval with the caveat that Harvey may wish to consider certain conditions related to the further development of final standard operating procedures, emergency response, closure plans, and spill preventions countermeasures.

Following the expiration of the thirty-day period of post-hearing comment, the Harvey Zoning Board of Appeals issued its recommendation to deny local siting approval. Harvey adopted an ordinance rejecting Industrial's application. Industrial then filed with the Pollution Control Board (Board) its siting appeal pursuant to Illinois statute. Its appeal was based on the argument that Harvey's denial of its application was against the manifest weight of the evidence.

On June 12, 1990, the Board held a hearing on the appeal and on September 27, 1990, the Board issued its opinion and order, with two members dissenting. The Board affirmed Harvey's decision as to the first, second, fifth, and seventh criteria, but reversed as to the sixth.

OPINION

■■ Industrial was required to sustain its burden of establishing all nine criteria set out in section 39.2(a) of the Act before local siting approval could be granted. (See *Waste Management of Illinois, Inc. v. Pollution Control Board* (1988), 175 Ill. App. 3d 1023, 1030, 530 N.E.2d 682, *appeal denied* (1989), 125 Ill. 2d 575, 537 N.E.2d 819.) Industrial contends that it presented a *prima facie* case on each of the disputed elements and that Harvey failed to rebut the evidence or impeach it to any material degree; therefore, the decision of the Board is against the manifest weight of the evidence. See *Fairview Area Citizens Taskforce v. Pollution Control Board* (1990), 198 Ill. App. 3d 541, 554, 555 N.E.2d 1178, *appeal denied* (1990), 133 Ill. 2d 554, 561 N.E.2d 689 (Opponents of siting approval failed to establish how the siting application was inadequate; their challenge that the siting request lacked sufficient detail could not prevail where they failed to submit evidence in support of their contention).

In general, the Board asserts that Industrial's showing was flawed by "assumption, guesses, and conjecture." In support, the Board quotes excerpts from Industrial's request for site location approval. The excerpts refer to estimates, beliefs, and assumptions, which, according to the Board, are unsupported by facts.

CRITERION 1—PROPOSED FACILITY IS NECESSARY FOR INTENDED SERVICE AREA

Harvey's engineering consultant, STV, concluded in its review of Industrial's proposal, "There is *little doubt of the need* for environmentally sound facilities such as that proposed by [Industrial] on a local and regional basis." (Emphasis added.) The Board, in its opinion, specifically found that the evidence relating to the fuel-blending wastes satisfied the need criterion. The Board also noted that Harvey did not challenge the need for the soil remediation operations. Accordingly, the Board's affirmance of Harvey's decision that criterion 1 was not satisfied relates only to the processing of medical wastes.

Industrial contends that the Board's position on this criterion is "demonstrably incorrect," citing some of the data upon which the expert witnesses relied in rendering an opinion on the need for the facility. For example, a source reference entitled *Hospital Statistics* (American Medical Society 1988) listed the number of hospitals in Illinois (250) and the number located in the Chicago area (80). According to Industrial's evidence, these hospitals generate approximately 50,000 tons of waste per year, which must be rendered innocuous by incineration or autoclaving (steam sterilization) before being disposed of in a landfill. Also, there are other medical facilities, clinics, dental offices, and medical research laboratories that produce an amount of medical waste at least equal to that of the hospitals. Although some hospitals' waste incinerators may be upgraded or replaced to meet applicable environmental requirements for air emissions, Industrial maintains that many hospitals will likely switch to off-site facilities, such as the proposed Harvey plant, for management of their medical wastes. Of the estimated 50,000 tons of medical wastes generated in Illinois alone, only 4,250 tons can currently be processed in the one off-site medical waste incinerator operating in Illinois.

Andrews further testified that the demand for medical waste processing facilities is growing as a result of the Federal demonstration program for the tracking of medical waste (See 42 U.S.C.A. §§6992 through 6992K (West Supp. 1991)) and Illinois legislative efforts to control management of medical wastes. See Pub. Act 87—752, §56 *et seq.*, eff. Jan. 1, 1992 (amending Environmental Protection Act by adding

new provisions regarding potentially infectious medical waste) (to be codified in Ill. Rev. Stat. 1991, ch. 111½, par. 1056 *et seq.*).

Apparently, the Board determined that Industrial's anticipation of the region's future need for medical waste processing is conjectural and thus may be disregarded. In support of its position, the Board cites *Tate v. Pollution Control Board* (1989), 188 Ill. App. 3d 994, 544 N.E.2d 1176, *appeal denied* (1990), 129 Ill. 2d 572, 550 N.E.2d 565, for the proposition that matters of "expectancy" rather than "fact" need not be considered by the Board. The *Tate* court's comments regarding expectancies and facts took place in an altogether different context from that which exists in the pending case, however.

In *Tate*, the petitioners, area residents, were opposed to the expansion of a landfill in Macon County. The county board and the Illinois Pollution Control Board had approved the expansion of the landfill without considering the petitioners' evidence that there was another landfill, in Clinton, located within 15 miles. The Clinton landfill had just received local siting approval and the petitioners offered that information as being probative on the criterion of need for the Macon County landfill expansion. The issue was whether the Board's refusal to consider this offer of proof rendered the hearing before the Board fundamentally unfair.

The appellate court in *Tate* held that the citizens appearing before the Macon County board to be heard on the landfill expansion application could insist that the procedures comported with standards of fundamental fairness, but that they were not entitled to the constitutional due process elements of a fair trial. (*Tate*, 188 Ill. App. 3d at 1019, 544 N.E.2d at 1193.) The court went on to find that the petitioners presented no evidence as to how much waste, if any, that the Clinton landfill would have accepted from Macon County. Further, the court said, since the Illinois Environmental Protection Agency had not yet approved the Clinton landfill site, the 50-year capacity of the Clinton site was "not a fact, but merely an expectancy"; therefore, it was not essential that the Board consider the Clinton facility in deciding whether the expansion of the Macon County landfill was necessary to serve the needs of the intended area. There was no evidence that Clinton was providing services to Macon County or would be able to do so. Consequently, "the [Pollution Control Board's] refusal of the offer of proof was not a denial of fundamental fairness to the petitioners." *Tate*, 188 Ill. App. 3d at 1020, 544 N.E.2d at 1193.

■ In the pending case, Industrial has presented facts and expert opinion to support its showing that the Harvey facility is necessary to serve the waste needs of the area. No contrary evidence was admitted

or even offered at the hearing. In fact, the Board's opinion summarized Industrial's evidence without explaining in what respects it was inaccurate or incomplete. Instead, the Board found that Industrial's assumptions regarding the need for medical waste treatment were "in the nature of conjecture based on the limited data available." Despite its recognition that "the proposed [medical waste] incinerator is indeed impressive and the superior quality of the incinerator might attract large numbers of generators" and that "Industrial's business judgment may well prove to be correct," the Board found that Industrial had not sufficiently shown that the proposed facility is "necessary." By its conclusion the Board disregarded STV's unequivocal statement that there was "no doubt" about the need for such a facility as proposed by Industrial.

In its appellate brief the Board maintains its position that Industrial's showing of need was inadequate. It argues that Industrial failed to explore alternative methods of treating medical waste and failed to substantiate its estimation of what percentage of medical wastes will actually require off-site treatment. We reject the Board's contention. It is difficult to understand what more Industrial should have done, since there will always be some element of projection or estimation when anticipating the growing waste needs of an area. Moreover, since the Board agrees that the proposed facility is necessary for the management of two other waste streams, soil remediation and fuel blending, we are not persuaded that the challenge to the showing on the need for medical waste management is well-taken.

Finally, while the parties have suggested that the term "necessary" may connote different things to different courts, we decline to enter what appears to be a semantic battle. That different courts may use different phraseology does not, in our view, mean that the various districts of the appellate court apply substantively different definitions. See, *e.g., Clutts v. Beasley* (5th Dist. 1989), 185 Ill. App. 3d 543, 546, 541 N.E.2d 844 (A proposed facility is "necessary" if it is "expedient" or "reasonably convenient"); *E & E Hauling, Inc. v. Pollution Control Board* (2d Dist. 1983), 116 Ill. App. 3d 586, 451 N.E.2d 555), *aff'd on other grounds* (1985), 107 Ill. 2d 33, 481 N.E.2d 664; but *cf. Waste Management of Illinois, Inc. v. Illinois Pollution Control Board* (2d Dist. 1984), 123 Ill. App. 3d 1075, 1084, 463 N.E.2d 969 ("expedience" connotes an element of *urgency* in the definition of need). See generally *Waste Management of Illinois, Inc. v. Pollution Control Board* (3d Dist. 1984), 122 Ill. App. 3d 639, 645, 461 N.E.2d 542, 546 (To satisfy the "necessary" element, which connotes a degree of "requirement" or "essentiality," the proposed facility must be

"reasonably required by the waste needs of the area intended to be served, taking into consideration the waste production of the area and the waste disposal capabilities, along with any other relevant factors").

In our opinion, Industrial has amply established the need for the proposed facility and the Board has failed to explain why a finding to the contrary is not against the manifest weight of the evidence. Therefore, we reverse the Board's ruling as to Criterion 1.

CRITERION 2—FACILITY MUST BE DESIGNED AND OPERATED TO PROTECT THE PUBLIC HEALTH, SAFETY, AND WELFARE

The Board's ruling that Industrial failed to satisfy the public safety criterion is based, again, on what it terms incomplete data or a lack of specificity on the part of Industrial. Significantly, there is no evidence of record to demonstrate that the design of the facility is flawed from a public safety standpoint or that its proposed operations present an unacceptable risk to the public health, safety, and welfare. No one testified, for example, how particular design features or operating procedures might increase the risk of harm to the residents. No expert witness testified that the design and proposed operation of the facility were flawed or that Industrial's application ignored or violated any of the applicable governmental regulations. Nonetheless, the Board concluded that Harvey's adverse finding as to criterion 2 was not against the manifest weight of the evidence.

Industrial offered the testimony of three expert witnesses who testified without contradiction that the proposed facility is designed in accordance with all applicable government requirements, that the design incorporates the recommendations and requirements of a fire safety design and review plan, and that the safety features of the plan *exceed* the minimum requirements of all governmental agencies. The site is close to fire and police services and emergency medical services, as well.

The Board maintains, however, that Harvey was well within its authority to reject the proposal based on Harvey's determination that Industrial's offering fell short of establishing that the public health and safety would be protected. In support, the Board quotes from the final report of STV, Harvey's consultant, that STV was unable to recommend unconditional siting approval in light of the "current level of project information," which did not include "actual detailed design" accompanied by "the proposed environmental controls."

In response to the STV report, Industrial presented to Harvey and the Board supplemental material, including an exhibit containing

202 pages of details. This exhibit incorporated drawings and design information and patents. The Board concedes on appeal that the additional information indicates how the medical waste incinerator would be built but argues that it "tells little about how the public health, safety, and welfare will be protected." The Board also notes that residents live as close as 700 feet to the site and schools are within six blocks. The land between the site and the nearest resident is vacant and undeveloped, however, which presumably would retard the spread of fire.

■ While we do not wish to denigrate legitimate safety concerns of Harvey and its residents, we find virtually nothing in the record to substantiate the fear of significant risk to the populace. On the contrary, the undisputed fact is that all governmental minimum standards have been met and exceeded and that the facility will employ state-of-the art technology to ensure safe levels of emissions in the ordinary operation of the plant. Nothing indicates that Industrial's controls and procedures, safety features, training of personnel, or security systems are substandard or create a significant safety hazard.

We conclude that Harvey failed to rebut or contradict Industrial's showing that the facility was designed in light of the public health, safety, and welfare. Therefore, the Board's affirmance of Harvey's finding on that criterion is against the manifest weight of the evidence.

CRITERION 5—MINIMIZE THE DANGER TO THE SURROUNDING AREA FROM FIRE, SPILLS, AND OTHER OPERATIONAL ACCIDENTS

The issue here, as in the second criterion, is one of safety, with the emphasis on planning to avoid or minimize the danger from catastrophic accidents. As in any industrial setting, there is a potential for harm, both to the environment and to the residents of the area. We doubt that the legislative intent behind criterion 5 was to hold applicants to so high a standard as to guarantee an accident-proof facility, however. See *Wabash & Lawrence Counties Taxpayers & Water Drinkers Association v. Pollution Control Board* (1990), 198 Ill. App. 3d 388, 394, 555 N.E.2d 1081, 1086 ("The key, here, however is *minimize*. There is no requirement that the applicant guarantee no accidents will occur, for it is virtually impossible to eliminate all problems." (Emphasis in original)).

In addition to expert testimony, Industrial offered information regarding the disposal of residues; the system for suppressing and containing fires; training of personnel; spill prevention control and countermeasures; closure and post-closure requirements; storm water

management; and other information contained in Industrial's exhibits 13 and 15. STV had submitted its report without the benefit of the material in these exhibits, which were subsequently admitted into evidence without rebuttal or impeachment.

The STV report did note that groundwater at the site was "expected" at depths of less than 20 feet and that the "greatest potential impact on groundwater resources from the proposed facility would be from an unexpected release of industrial wastes into soil areas." The STV did not recommend denial of siting approval based on the possibility of such a happening, however. Indeed, the STV favored conditional approval, contingent on the receipt of more complete information on criteria 2, 5, and 7. In fact, the STV's project manager confirmed at the hearing of January 29, 1990, that "the facility could be constructed at the site and operated in an environmentally sound and safe manner, provided that state-of-the-art control technologies were implemented." The STV formally recommended approval, with the qualification that Harvey may wish to impose certain conditions.

■ From the record it appears that Industrial attempted to answer all stated concerns about incomplete information, particularly those expressed in the STV report. Industrial submitted exhibit 14 on the design of the medical incinerator and its environmentally sound features. Exhibits 13 and 15 supplied additional information regarding standard and emergency safety measures. In our view, Industrial met its burden of establishing that it had minimized the danger of operational accidents. Without something in the way of contradicting or impeaching evidence, Industrial's detailed showing stands unrebutted. Consequently, we find that the decisions of Harvey and the Board with respect to criterion 5 are against the manifest weight of the evidence.

CRITERION 7—EMERGENCY RESPONSE PLAN FOR ACCIDENTS, INCLUDING NOTIFICATION, CONTAINMENT, AND EVACUATION PROCEDURES

Once again, the dispute over this criterion relates to the completeness of the submitted materials. We have already discussed the existence of Industrial's emergency response plan, which includes the fire suppression system, the sealing of secondary containment areas, spill prevention control and countermeasures, and the training of employees. The plan includes notification to the employees, plant evacuation, and coordination with the police, fire department, and emergency medical facilities. The Board challenges the plan, however, as being vague in its design and practical implementation.

The statute does not set out standards for the emergency response plan. Undoubtedly, the requirement for such a plan is to enhance the safety of the people in and around the facility and to focus the applicant's attention on how to most effectively handle emergency situations. While the sufficiency of any emergency response plan may be open to discussion, the Board's criticism of Industrial's plan as merely conceptual seems unfounded. Industrial's plan is a reasonable blueprint or overview of the procedures to be instituted in the case of an emergency at the facility. During the siting request proceedings it may be unrealistic to expect an applicant to secure all details that would be included in coordination agreements with the police, fire department, and disaster relief agencies. An emergency response plan necessarily requires cooperation among the agencies responsible for providing fire protection and other safety services. To that extent, the on-site emergency response plan is only part of the total picture, and the only part that is within Industrial's control. Moreover, Industrial contends that the details of interagency coordination and cooperation agreements can be worked out following siting approval and before the Illinois Environmental Protection Agency issues a development permit.

We agree with Industrial. Its emergency response plan designates the persons responsible for implementing the emergency procedures and sets out two primary notification systems on site. Evacuation procedures are described, and, in the event that outside services are needed, the emergency coordinator at the plant is to summon the appropriate agency or agencies. Personnel at the facility will be instructed in the proper response to emergency conditions. In our opinion, Industrial's showing on criterion 7 was not rebutted or shown to be materially flawed. Consequently, we find that the decisions of Harvey and the Board were against the manifest weight of the evidence.

We conclude that the Board's affirmance of Harvey's denial of siting approval must be reversed. This is not a case in which there is a conflict in the evidence on any material issue of fact. Nor is it a situation in which the materials submitted are no more than bare sketches or skimpy outlines. On the contrary, the record substantiates Industrial's position that it made a *prima facie* showing as to each criterion and that Harvey did not offer contradicting or impeaching evidence to rebut the showing. The experts who testified on behalf of Industrial carried impressive credentials including extensive experience with similar facilities. Their opinions were based on facts and reasonable assumptions. Industrial operates other, similar facilities in

different locations and therefore has a track record. The technology and design of the facility was represented to be state-of-the-art (meaning, in this case, providing for a much higher degree of environmental protection than required under existing standards and laws), and nothing in the record contradicts that assertion. Harvey's own consultant, STV, concluded that the facility could be run in an environmentally sound manner and that there were no serious flaws in Industrial's proposal. Harvey did not come up with any reasonable ground for denying the application and the Board's attempt to justify the denial must be rejected.

In light of our decision we decline to comment on Industrial's contention that it was denied due process because of the Board chairman's comment regarding an alleged State "policy of rarely interfering with a community's authority to decide on whether landfills, incinerators, or waste transfer stations [are] to be located within its borders." We recognize the normal deference to be given a community's decision, as long as it is not against the manifest weight of the evidence. Such facilities should not be forced upon unwilling host communities. Nevertheless, when an applicant provides the requisite information and evidence on all of the statutory criteria (which appear to be fairly rigorous), the Board should not abdicate its statutory role in the siting approval process.

The duty of this court is to determine whether the decision below was against the manifest weight of the evidence, not to speculate on the political or social or economic consequences of approving Harvey as the location of a regional pollution control facility. Accordingly, we reverse the decision of the Illinois Pollution Control Board. We hold that the site location in Harvey, Illinois, shall be considered approved as required under section 39(c) of the Act (Ill. Rev. Stat. 1989, ch. 111½, par. 1039(c)) and remand for whatever proceedings are necessary to complete the application process.

Reversed and remanded.

McMORROW and JOHNSON, JJ., concur.