NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 230075-U

NO. 4-23-0075

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 30, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* B.E., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Sangamon County |
| Petitioner-Appellee, | ) | No. 21JA3 |
| | ) | |
| v. | ) | |
| Sunset E., | ) | Honorable |
| Respondent-Appellant). | ) | Karen S. Tharp, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices Turner and Doherty concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The trial court's determination that it was in the minor's best interest to terminate
             respondent's parental rights was not against the manifest weight of the evidence.

¶ 2     In October 2022, the State filed a motion to terminate the parental rights of

respondent, Sunset E., as to her minor child, B.E. B.E.'s father, Richard S., is not a party to this

appeal. In January 2023, the trial court granted the State's petition and terminated respondent's

parental rights. (We note B.E. is at times referred to as B.S. in the record. For consistency, we

refer to her as B.E. throughout this disposition.)

¶ 3     Respondent appeals, asserting the trial court erred in determining it was in B.E.'s

best interest to terminate her parental rights. We affirm.

¶ 4                                    I. BACKGROUND

¶ 5        In January 2021, the State filed a petition against respondent, alleging B.E. was neglected under section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2020)) in that her environment was injurious to her welfare. The State alleged B.E. had siblings who were previously adjudicated neglected, and respondent had failed to make reasonable progress toward having them returned to her care. The State also alleged B.E. was neglected due to ongoing domestic violence between respondent and Richard. The trial court adjudicated B.E. neglected and found it was in her best interest to be made a ward of the court.

¶ 6        In July 2022, the State filed a motion to terminate respondent's parental rights, which it amended in October 2022. The amended motion alleged respondent was unfit because she (1) failed to maintain a reasonable degree of interest, concern, or responsibility as to B.E.'s welfare and (2) failed to make reasonable efforts to correct the conditions which were the basis for the removal of B.E from her care within two different nine-month periods after the adjudication of neglect. The State also sought to terminate Richard's parental rights. Richard voluntarily gave up his parental rights and consented to adoption of B.E.

¶ 7        Respondent stipulated to the allegations of unfitness and, on January 19, 2023, the trial court conducted a best-interest hearing. Respondent's counsel moved to continue the hearing, telling the court B.E.'s sibling, A.S., who had just turned one year of age, was currently in foster care in another case. Counsel argued it was possible A.S. could be returned to respondent's care and suggested the matter be continued until after a legal screen in that case could be completed. The State told the court B.E. and A.S. visited each other, noted the current case had been pending since 2021, and argued delaying the case would not be in the best interest of B.E. Salena Young, the guardian *ad litem* for both B.E. and A.S., stated she was looking at not just any given nine-month period, but instead at the "whole picture." She believed reunification

of the siblings and their mother would be in the best interest of the children, so she agreed with continuing the case. The court stated the case was past the unfitness stage, with the focus now on the child instead of respondent. The court considered each child individually and stated there could be different paths taken for each child. Accordingly, the court denied the motion.

¶ 8 At the hearing, McKenzie Vorreyer, a caseworker with the Illinois Department of Children and Family Services (DCFS), testified she handled the case since January 2021. Vorreyer said B.E. had been in the same foster home since birth. A.S. was in a separate adoptive foster placement, and the foster parents arranged visits between the siblings several times per month. The visits went well, and the siblings were very bonded. Having spoken to B.E.'s foster parent, Vorreyer believed, even if A.S. were returned to respondent, the siblings would still have a relationship. B.E.'s foster parent was also open to a continued relationship between B.E. and respondent. B.E referred to her foster parent as "Mom." Her foster parent also had an adopted 16-year-old daughter, whom B.E. referred to as "Sissy," and who interacted with B.E. "[w]onderfully." Vorreyer testified B.E.'s medical, emotional, educational, and social needs were being met. B.E. was in daycare and "thriving there." B.E. had her own room in her foster home that was recently redone. Vorreyer testified there was definitely a bond between B.E. and her foster parent.

¶ 9 Vorreyer also testified respondent had visits once per month with B.E. Vorreyer had not been to the visits and did not know how B.E. addressed respondent. She had read reports about the visits and reported the interactions between respondent and B.E. went well. The reports did not provide in-depth information as to whether there was a sense of attachment between respondent and B.E.

¶ 10        Vorreyer testified respondent's parental rights had previously been terminated as to four or five other children. Vorreyer also testified that a major concern in the case was instances of domestic violence between respondent and Richard. A June 2022 permanency report described respondent's history as a victim of domestic violence. In the report, Vorreyer and a public service administrator stated it had become apparent over the life of the case that domestic violence was a significant safety threat to B.E. and A.S. While Vorreyer had not received any recent reports of domestic violence, she felt that was due in part to Richard's arrest in February 2022 for domestic battery and criminal damage to property. The domestic battery charge arose out of an incident in which he assaulted another paramour while he was looking for respondent to kill her. On the night of the incident, Richard forced the paramour to drive him to find respondent, and he attempted to break into respondent's home.

¶ 11        According to the June 2022 permanency report, after Richard's arrest, visitation records and phone logs from the jail showed respondent visited Richard on March 13 and March 20, 2022. She also had five to six daily phone calls with Richard. When asked about the visits and phone calls, respondent told Vorreyer, " 'I don't know what you want me to do. I love this man and he is the father of my children.' " Vorreyer was able to obtain phone call recordings through March 2022 between respondent and Richard. During the calls, Richard could be heard yelling loudly at respondent and threatening her. The report also noted Richard previously threatened B.E. and A.S. in statements to DCFS employees.

¶ 12        Respondent obtained an emergency order of protection against Richard on April 19, 2022, but it was vacated on May 5, 2022, when respondent did not show up to court. She filed for another order of protection on May 23, 2022. The June 2022 permanency report noted that, while respondent had completed multiple services and had sought legal intervention, there

- 4 -

was still a significant concern about her ability or willingness to protect children in her care. Thus, the reporters opined that, given the history of domestic violence, "it is the assessment of DCFS that the children would be at an extreme risk of danger in the care of [respondent] or [Richard]."

¶ 13　　　At the hearing, Vorreyer stated, as far as she was aware, respondent had not contacted Richard since May 2022. However, Vorreyer testified respondent told her about an October 2022 incident where respondent was giving plasma and Richard showed up. There was a verbal altercation, and Richard told respondent he was going to kill her. Respondent had an order of protection against Richard at that time but did not call the police or ask someone to call the police for her.

¶ 14　　　Vorreyer testified that, although respondent "went through the process," she did not feel respondent was fully able to stay in a relationship free from domestic violence, because "that [had] been a continuation throughout her entire life." Vorreyer stated she felt respondent was "going through the motions" rather than specifically focusing on the best interest of her children. Vorreyer stated she spoke with respondent's psychologist and, based on that conversation, Vorreyer opined respondent would need more therapy before she could show she had moved past her issue of being in multiple relationships involving domestic violence. Vorreyer stated she was concerned for B.E.'s safety based on the relationships respondent engaged in. However, she also stated Richard's primary target had always been respondent.

¶ 15　　　At the time of the hearing, respondent was currently dating another man, "Mr. Cody," who had his own DCFS case involving his own biological children. In the June 2022 permanency report, Vorreyer reported it was concerning that, shortly after Richard went to jail, respondent was already in a serious relationship with Cody. Cody was reportedly living with

respondent and was going to help her raise the girls. Vorreyer did not know many details of Cody's DCFS case but stated he was not required to complete domestic violence services based on information he reported for an integrated assessment. Vorreyer was not satisfied with the contact she had with Cody, but he had completed almost all his required services. She also was not aware of any domestic violence issues with Cody. However, respondent had also mentioned she was planning to leave Cody.

¶ 16 Vorreyer testified respondent had successfully completed almost all of her required services outside of those addressing her domestic violence issues. She completed parenting classes, substance abuse treatment, and mental-health services. Respondent was employed at Buffalo Wild Wings. Her previous housing was insufficient, and Vorreyer had received notice respondent was going to be evicted for being behind on payments. DCFS helped respondent get "Norman Funds" to move into new housing.

¶ 17 Vorreyer opined it was in the best interest of B.E. to remain in her current placement because she had been there since birth, was very bonded with her foster parent, and considered her foster parent her "Mom." Vorreyer felt it was in B.E.'s best interest to be adopted.

¶ 18 Respondent testified she was currently employed and had sufficient income to support herself. She was living in a trailer DCFS helped her obtain. Her previous residence had a lot of safety issues, and she moved before eviction proceedings started. She was allowed to have visitations at the new residence. Respondent stated that, during her two-hour visits, she and B.E. would play. When B.E. got fussy, respondent would rock her to sleep. Sometimes they would take a walk if it was nice outside. Respondent would give B.E. a snack or change her diaper if needed during the visits. Respondent said she had a strong bond with B.E., stating, "She is like attached to my hip." She said B.E. did not want to leave after their last visit and that B.E. called

her "Mom." Respondent admitted missing recent monthly visits but stated she was sick. She did not request a Christmas visit because she did not know she was allowed holiday visits.

¶ 19　　　　Respondent testified her last phone call with Richard was in March 2022. She had moved to make it more difficult for him to find her and had no contact with him until the October 2022 incident. During that incident, Richard showed up while respondent was giving plasma and started cursing at her. He then "stormed off." She denied Richard threatened her. Respondent admitted she did not call the police. She said she asked people at the plasma center to call the police, but they said it was not necessary because Richard had left the premises. She said the plasma center took a copy of the order of protection so they would know to ask Richard to leave if he showed up again while respondent was there. Respondent testified Richard never threatened the children. She completed a domestic violence class in June 2021 and was taught how to stay away from situations involving domestic violence but admitted that she still went back to Richard in January 2022.

¶ 20　　　　Respondent testified there were no physical altercations between her and Cody, and she was not aware of any domestic-violence history concerning him. She explained the fact that Cody's children were not allowed to sleep in the same home as her was taking a toll on their relationship. Respondent had considered breaking up with Cody to avoid coming between him and his children. She testified she had learned though her classes and counseling how to prevent domestic violence in her household.

¶ 21　　　　During closing statements, the guardian *ad litem* stated she believed the State met its burden of showing it was in B.E.'s best interest to terminate respondent's parental rights. She stated respondent had failed to become a fit parent over many years involving her other children and there were concerns for the safety of children in her care. She noted it would be hard for B.E.

and A.S. to be separated if A.S. were returned to respondent but stated they were already separated, and it appeared those visits would continue going forward.

¶ 22　　　　The trial court found it was in the best interest of B.E. to terminate respondent's parental rights. The court noted the requirements of the Juvenile Court Act and found B.E. had just turned two and been in foster care her entire life. The court stated it was not considering the eviction against respondent, nor was it considering anything about Cody's relationship with respondent against her. Instead, the main issue the court considered was domestic violence.

¶ 23　　　　The trial court observed that respondent took domestic violence classes in 2021 yet continued in a relationship with Richard until January 2022. She then contacted him when he was in jail and said she would continue to do so. The court specifically found Vorreyer's testimony on that matter credible. The court further observed respondent failed to show up at a hearing for an order of protection and did not take action when Richard showed up at the plasma center. The court found respondent "told *** a different story" in court from what she originally told Vorreyer about threats during the incident. The court considered additional factors, such as the visits between respondent and B.E., noting they went well and there was likely some bond between them, but they were short in duration. The court also noted two nine-month time periods had passed and emphasized the need for permanence. It further found the foster mother was willing to maintain contact with A.S. and was open to contact with respondent if an adoption occurred. Finally, the court stated there would likely be issues if A.S. were to go home to respondent but that it had to look at "right now" and the best interest of B.E. Thus, the court found the State proved by a preponderance of the evidence that it was in the best interest of B.E. to terminate respondent's parental rights.

¶ 24　　　　This appeal followed.

¶ 25                                    II. ANALYSIS

¶ 26            On appeal, respondent contends the trial court erred in finding it was in B.E.'s best interest to terminate her parental rights. She argues the evidence does not support the court's findings and that the State failed to prove the matter by a preponderance of the evidence. Respondent does not argue the court erred in its finding of unfitness.

¶ 27            Involuntary termination of parental rights under the Juvenile Court Act (705 ILCS 405/1-1 *et seq*. (West 2020)) is a two-step process. *In re J.H.*, 2020 IL App (4th) 200150, ¶ 67. The State must first prove by clear and convincing evidence that the parent is unfit under any single ground listed in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)). *Id.* Respondent here conceded she was unfit and does not challenge that determination on appeal.

¶ 28            Once a parent has been found unfit under one or more grounds set out in the Adoption Act, the State must establish by a preponderance of the evidence that it is in the minor's best interest to terminate parental rights. 705 ILCS 405/2-29(2) (West 2020); *In re Tyianna J.*, 2017 IL App (1st) 162306, ¶ 97. "Proof by a preponderance of the evidence means that the fact at issue *** is rendered more likely than not." *People v. Houar*, 365 Ill. App. 3d 682, 686 (2006). Once a parent is found unfit, the focus shifts to the child, and the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life. *In re D.T.*, 212 Ill. 2d 347, 364 (2004). Thus, following an unfitness finding, the trial court focuses on the needs of the child in determining whether parental rights should be terminated. *In re J.V.*, 2018 IL App (1st) 171766, ¶ 249. " 'A child's best interest is superior to all other factors, including the interests of the biological parents.' " *Id.* (quoting *In re Curtis W.*, 2015 IL App (1st) 143860, ¶ 52).

¶ 29        The Juvenile Court Act lists several factors the trial court should consider when

making a best-interest determination. Those factors, considered in the context of the child's age

and developmental needs, include the following:

> "(1) the child's physical safety and welfare; (2) the development of the child's
>
> identity; (3) the child's background and ties, including familial, cultural, and
>
> religious; (4) the child's sense of attachments, including love, security,
>
> familiarity, and continuity of affection, and the least-disruptive placement
>
> alternative; (5) the child's wishes; (6) the child's community ties; (7) the child's
>
> need for permanence, including the need for stability and continuity of
>
> relationships with parental figures and siblings; (8) the uniqueness of every family
>
> and child; (9) the risks related to substitute care; and (10) the preferences of the
>
> persons available to care for the child." *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071
>
> (2009) (citing 705 ILCS 405/1-3(4.05) (West 2008)).

Also relevant in a best-interest determination is the nature and length of the minor's relationship

with his or her present caretaker and the effect that a change in placement would have on the

child's emotional and psychological well-being. *In re William H.*, 407 Ill. App. 3d 858, 871

(2011).

¶ 30        This court will not reverse a trial court's finding it was in a minor's best interest

to terminate his or her parental rights unless it is against the manifest weight of the evidence.

*In re Anaya J.G.*, 403 Ill. App. 3d 875, 883 (2010). A finding is against the manifest weight of

the evidence only where the opposite conclusion is clearly apparent. *Id.*

¶ 31        Here, the record shows the trial court's determination was not against the manifest

weight of the evidence. The court noted the requirements of the Juvenile Court Act, and its

findings were supported by the evidence. The court found B.E., who had been in the same foster home since birth, needed stability, and her foster parent's home met her medical, emotional, educational, and social needs. B.E. was bonded with her foster family and doing well in her placement, which was expected to lead to permanency. Meanwhile, the State presented evidence respondent was not able to provide satisfactory care based on her history of engaging in dangerous relationships, which her caseworker felt placed B.E. in danger.

¶ 32 Respondent argues she established she had moved past her history of relationships involving domestic violence, noting she had completed domestic violence classes, had not contacted Richard in almost a year, and had obtained an order of protection against him. But respondent also showed a history of returning to abusive relationships. She admitted she returned to a relationship with Richard after completing a domestic violence course, and she contacted him multiple times while he was in jail following a serious domestic-violence incident in which he threatened her life. Vorreyer also testified respondent failed to act when Richard threatened respondent in October 2022. She further opined respondent would need more counseling before she could safely provide a home for B.E. The trial court found Vorreyer's testimony credible.

¶ 33 Respondent also argues the trial court failed to consider her bond with B.E. However, the court discussed that factor, noting there was likely a bond, but the court also noted the visits were short. Respondent further argues the court failed to consider B.E.'s bond with A.S. and suggests the court's denial of her motion to continue shows it disregarded that factor. She further notes the guardian *ad litem* agreed at the time of the motion to continue that it was in the best interest of B.E. to continue the matter. But the court discussed that factor as well, and it ultimately determined that, while there could be hypothetical difficulties if A.S. were eventually returned to respondent, there was also evidence the relationship between B.E. and A.S. would

continue. At the hearing, the guardian *ad litem* also told the court she believed the State met its burden of showing it was in B.E.'s best interest to terminate respondent's parental rights. Ultimately, the court decided B.E.'s immediate needs were at issue. Considering B.E. had been in foster care for two years, permanency was an important factor. Under these circumstances, where B.E. is well cared for in her placement and respondent's inability to provide permanency in the foreseeable future was established, the facts do not clearly demonstrate the court should have reached the opposite result in making its best-interest determination.

¶ 34　　　Essentially, respondent is asking this court to reweigh the evidence, something which we cannot do under a manifest weight of the evidence analysis. It is the province of the trier of fact to weigh the evidence, resolve conflicts in testimony, and assess the credibility of the witnesses. *People v. Evans*, 209 Ill. 2d 194, 211 (2004). This court has long held, "[a] reviewing court is not in a position to reweigh the evidence, but can merely determine if the decision is against the manifest weight of the evidence." *Tate v. Pollution Control Board*, 188 Ill. App. 3d 994, 1022 (1989) (citing *Jackson v. Board of Review of the Department of Labor*, 105 Ill. 2d 501, 513 (1985)). Further, the trial court "receives broad discretion and great deference" in matters involving minors. *In re D.D.*, 2022 IL App (4th) 220257, ¶ 28 (citing *In re E.S.*, 324 Ill. App. 3d 661, 667 (2001)). In sum, we agree with the State that the evidence adequately addressed multiple statutory factors and the court's best-interest determination was not against the manifest weight of the evidence.

¶ 35　　　　　　　　　　III. CONCLUSION

¶ 36　　　For the reasons stated, we affirm the trial court's judgment.

¶ 37　　　Affirmed.