NOTICE

Decision filed 06/23/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 250040-U

NO. 5-25-0040

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* AUTUMN S., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Macon County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 24-JA-195 |
| | ) | |
| Brandon S., | ) | Honorable |
| | ) | Erick F. Hubbard, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE MOORE delivered the judgment of the court.
Presiding Justice McHaney and Justice Cates concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The dispositional order of the circuit court of Macon County that found it to be in the best interest of the minor to be made a ward of the court and appointing DCFS guardianship of the minor is affirmed because the circuit court's findings were not against the manifest weight of the evidence and the selected disposition was not an abuse of discretion.

¶ 2    Following a dispositional hearing, the court adjudicated Autumn S. a ward of the court and appointed the Department of Children and Family Services (DCFS) as her guardian. Brandon S., the respondent and father of Autumn, appeals, arguing that the circuit court erred by adjudicating Autumn a ward of the court and appointing DCFS as her guardian. We disagree and affirm.

1

¶ 3                                    I. BACKGROUND

¶ 4     This case began with the filing, on September 24, 2024, of, *inter alia*, a petition for adjudication of wardship regarding the respondent's minor child, Autumn, who was born in August of 2008. The petition alleged that Autumn was neglected pursuant to section 2-3(1)(a) and (b) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3(1)(a), (b) (West 2024)) because she was a minor under the age of 18 whose environment was injurious to her welfare. As factual support, the petition contained several allegations relating to Autumn, including that she had mental health problems, such as suicidal ideation, and that the respondent was not keeping her medicated as prescribed. Additionally, the petition alleged that Autumn was abused in that the respondent created a substantial risk of physical injury to her by other than accidental means, which would be likely to cause death, disfigurement, impairment of physical or emotional health, or loss or impairment of any bodily function under section 2-3(2)(ii) of the Act. *Id.* § 2-3(2)(ii). As factual support, the petition restated the aforementioned factual allegations and indicated that the respondent was physically violent towards Autumn. At the time the State filed the petition, DCFS had custody of Autumn.

¶ 5     That same day, DCFS filed a shelter care report. The report alleged that on September 19, 2024, the respondent "shoved Autumn into a hallway; a sink; and, finally, into a door" during an argument about her grades. During this argument, the respondent reportedly told Autumn that she "will go nowhere in life." That evening, Autumn reportedly ran into the street in an attempt to end her life. The Macon County Sheriff's Department and emergency medical services arrived at the scene. Autumn communicated to the responders that "she was trying to get away from [the respondent] because he hit her on the shoulder, *** threw her into a wall, and tore her shirt." In

previous incidents, the shelter care report indicated respondent was physically abusive toward Autumn, including dragging and hitting her.

¶ 6 Additionally, it was reported that the respondent encouraged Autumn to harm herself. Autumn communicated to responders that she experiences mental health issues, including suicidal thoughts and self-harm. Autumn also communicated that she had been unable to take her medications for over 30 days because the respondent had not taken her to see a psychiatrist for a follow-up appointment to obtain a refill. The respondent acknowledged to ambulance staff that Autumn had not been medicated. Autumn was then reportedly involuntarily taken to a nearby hospital for mental health care, and the respondent chose not to accompany her. DCFS contacted Autumn's biological mother, Kimberly V., to inform her about the situation involving Autumn. DCFS reportedly informed Kimberly that if a parent was not present, hospital staff must report the matter to DCFS for potential abandonment. Kimberly reportedly stayed with Autumn during her hospital admission and attempted to reach the respondent to determine his whereabouts. The respondent, who reportedly appeared intoxicated, informed Kimberly that he "did not have to be there." On September 20, 2024, Autumn was transferred to Lincoln Prairie Behavioral Health Center (LPBHC) in Springfield, Illinois. The report indicated that Autumn had been admitted to LPBHC multiple times and had been diagnosed with major depressive disorder and generalized anxiety.

¶ 7 Following a shelter care hearing on September 24, 2024, attended by the respondent, the circuit court found that probable cause for the filing of the petition existed, that there was an immediate and urgent necessity to remove Autumn from the respondent's home, and that leaving Autumn in the home would be contrary to her health, safety, and welfare based on the shelter care report. Autumn was then placed in temporary custody of DCFS.

3

¶ 8    An adjudicatory hearing[1] took place on December 9, 2024. The docket entry for that day indicated that the respondent appeared personally and by his attorney. The entry also notes that "witnesses were sworn and evidence was heard." At the conclusion of the hearing, the court issued a written order finding that the State had demonstrated, by a preponderance of the evidence, that Autumn had been neglected and abused. Additionally, the circuit court ordered a dispositional report to be prepared.

¶ 9    On December 18, 2024, DCFS filed a dispositional report with the court. The report consisted of 39 pages and included assessment information about Autumn, the respondent, and Kimberly. According to the report, Autumn began engaging in daily self-injurious behavior, such as cutting her forearms and thighs, when she was 13 years old. Autumn reported that the cuts would become deeper each time she experienced a crisis. To cope with her feelings, Autumn tries to write in her journal.

¶ 10    Further, the report noted that Autumn had been psychiatrically hospitalized on 10 occasions[2] and had attempted suicide multiple times. One of her suicide attempts involved taking an overdose of pills, while the others were through self-harm. It was reported that the respondent did not consistently follow through with Autumn's mental health treatment, and Autumn had been without psychotropic medications for 30 days. Autumn reported experiencing positive effects from being prescribed psychotropic medications, including increased motivation and a reduced urge to hurt herself.

---

[1]In this case, the respondent failed to include a report of proceedings, a bystander report, or an agreed statement of the facts from the adjudicatory hearing.

[2]Upon the opening of this case, the dispositional report indicated that Autumn was initially hospitalized at a behavioral health center on September 20, 2024, and was discharged on September 30, 2024. On November 5, 2024, Autumn was hospitalized after admitting to having thoughts of suicide and self-harm and was discharged on November 13, 2024. On November 28, 2024, Autumn was again admitted to a behavioral health center due to having thoughts of suicide and self-harm and was discharged on December 17, 2024.

¶ 11 Regarding the respondent, the dispositional report indicated that DCFS caseworker Heather Smith visited the respondent's home for a transitional visit on October 8, 2024. During the visit, Smith introduced herself and requested some of Autumn's belongings, including her journal. However, the respondent refused to provide the journal, asserting that he would use it against Autumn in court. Smith also asked if the respondent would consider attending supervised visitation, but he reportedly declined, stating that he would not comply with "anything the judge asks." He then reportedly said, "[Autumn] can be emancipated for all I care."

¶ 12 Additionally, Smith attempted to initiate the service referral process by providing the respondent with consent forms, which he declined to sign. Further, the report noted that Smith explained the integrated assessment process to the respondent and asked if he would be open to scheduling an appointment to participate. However, Smith was unable to conduct an integrated assessment due to the respondent's lack of cooperation. As such, some of the information contained in the dispositional report was sourced from a search of the State Automated Child Welfare Information System (SACWIS) for previous records. This search revealed that in 2013, the respondent completed an integrated assessment during a placement service case from September 2013 to October 2014. A service plan from November 22, 2013, recommended that the respondent undergo a domestic violence perpetrators assessment, which he did not complete and was uncooperative. The SACWIS search also highlighted a pattern of violent behavior by the respondent, including three assault charges, with the most recent arrest occurring on March 5, 2024, after an altercation with Autumn.

¶ 13 Further, the dispositional report indicated significant concerns regarding the respondent's ability to regulate emotions and respond to stress, which reportedly often led to physical and verbal altercations. The report supported this assessment by summarizing the case history in the

September 24, 2024, shelter care report, including the incident that occurred on September 19, 2024. Additionally, the dispositional report highlighted the respondent's parenting challenges, noting that his refusal to manage Autumn's medications and seek the appropriate mental health treatments placed her at a "grave risk." As a result, the report stressed that the respondent must substantially complete the recommended services[3] prior to his reunification with Autum, as "it is imperative for [the respondent] to acknowledge and show understanding as to how his choices have led to his repeated DCFS involvement and to the removal of his daughter." DCFS recommended that guardianship and custody of Autumn be placed with DCFS, that Autumn remain in substitute care until further notice, and that the respondent comply with the services provided by DCFS.

¶ 14    On January 22, 2025, the circuit court held a dispositional hearing. The first witness called by the State was Smith. Smith testified that she was a child welfare specialist for DCFS, and she was assigned as the caseworker for Autumn. Smith testified that when Autumn came into care, she was admitted to a residential facility for mental health issues; however, at the time of Smith's testimony, Autumn was hospitalized in a comprehensive assessment and treatment unit (CATU) of a hospital in Chicago, Illinois.

¶ 15    Regarding the respondent, Smith testified that an integrated assessment was eventually completed, and DCFS had recommended multiple services, none of which the respondent had yet begun. During Smith's testimony, she expressed uncertainty regarding whether the respondent intended to complete the service plan. Additionally, Smith's testimony described the respondent as aggressive. Smith testified that the respondent had attended meetings with DCFS wearing a shirt

---

[3]The respondent was recommended to, *inter alia*: (1) cooperate with Smith, (2) participate in individual psychotherapy, (3) attend court hearings, and (4) participate in relationship building activities with Autumn.

that contained Autumn's blood. Smith testified that it was her recommendation that Autumn not be returned to the respondent's care unless the required services had been completed. This testimony completed the State's witnesses.

¶ 16     Next, the respondent's counsel called Jathan Portis, a status worker for Heritage Behavioral Health Center, as a witness. Portis testified that he conducted a mental health assessment for Autumn on or about September 19, 2024. This assessment occurred at the respondent's home, during which Portis witnessed Autumn trying to harm herself and the respondent intervening. Portis testified that he called first responders. When questioned about his efforts to assist the respondent in getting Autumn enrolled in therapy and receiving psychotropic medication, Portis testified, "Well, that was the plan. Starting that day, we were trying to work on getting her back enrolled in therapy and medication."

¶ 17     The respondent then took the stand as a witness and testified that on September 19, 2024, he was "working with" Portis to arrange long term treatment for Autumn. His testimony described their collaboration as "making good progress" until Autumn "went manic and acted out, and then was taken." Specifically, during his testimony, the respondent explained that he and Portis had agreed to resume Autumn's medications; however, he testified that Autumn's medications were contributing to her self-harming behavior, stating they were "doing more damage than good." Because of this, the respondent testified that Autumn was without medications to see if it would improve her mental health, and he believed it did. Despite this belief, the respondent testified that he was open to exploring different medications and was willing to participate in classes or counseling for issues such as anger management or parenting. When asked about any investigations by DCFS prior to September 19, 2024, the respondent confirmed that DCFS opened

an investigation in March of 2024. He then testified that the investigation had been completed, and nothing was found. The following colloquy then occurred:

"[RESPONDENT'S COUNSEL]: Okay. But there was nothing from DCFS as far as you've done anything wrong before the September 19th day? Nothing was founded; correct?

[RESPONDENT]: Yes. On the—no, nothing was founded. But they—I guess I'm not understanding. So, back in March I was arrested for Domestic Battery. Okay? And the State dropped the charges on it. I didn't plead out or nothing."

The respondent then provided testimony regarding the incident on September 19, 2024, where Autumn had what he described as a "temper tantrum."

¶ 18    At the conclusion of the disposition hearing, the circuit court entered a written order finding that making Autumn a ward of the court was consistent with her health, welfare, and safety and was in her best interest. Additionally, the circuit court found the respondent to be unfit, for reasons other than financial circumstances alone, "to care for, protect, train, educate, supervise, or discipline the minor and placement with him is contrary to the health, safety, and best interest of the minor because see dispo [*sic*] report." This appeal followed.

¶ 19                                    II. ANALYSIS

¶ 20    On appeal, the respondent challenges the circuit court's dispositional order making Autumn a ward of the court and the disposition selected by the court that placed Autumn in the guardianship of DCFS.

¶ 21    The Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2024)) provides a step-by-step process to be used in determining whether a child should be removed from his or her parents and made a ward of the court. *In re Arthur H.*, 212 Ill. 2d 441, 462 (2004). The first step

8

of the process begins with the State filing a petition for wardship. *Id.* Then, a temporary custody hearing is conducted at which the court must "determine whether there is probable cause to believe that the child is neglected, whether there is an immediate and urgent necessity to remove the child from the home and whether reasonable efforts have been made to prevent the removal of the child or that no efforts reasonably can be made to prevent or eliminate the necessity of removal." *Id.* If probable cause is found, the child is placed in temporary custody and the process continues. *Id.*

¶ 22 The second step of the process, the adjudicatory hearing, requires the court to determine whether the child was the subject of abuse, neglect, or dependence. *Id.* If the State fails to prove the allegations of abuse, neglect, or dependence by a preponderance of the evidence, the petition must be dismissed. *Id.* at 464.

¶ 23 If a finding of abuse, neglect, or dependence is made, the third step is reached, at which point the circuit court must hold a dispositional hearing. 705 ILCS 405/2-21(2) (West 2024).

> "At the dispositional hearing, the court shall determine whether it is in the best interests of the minor and the public that the minor be made a ward of the court, and, if the minor is to be made a ward of the court, the court shall determine the proper disposition best serving the health, safety and interests of the minor and the public. The court also shall consider the *** permanency goal set for the minor, the nature of the service plan for the minor and the services delivered and to be delivered under the plan. All evidence helpful in determining these questions, including oral and written reports, may be admitted and may be relied upon to the extent of its probative value, even though not competent for the purposes of the adjudicatory hearing." *Id.* § 2-22(1).

¶ 24 "The purpose of a dispositional hearing is not to terminate parental rights." *In re April C.*, 326 Ill. App. 3d 225, 237 (2001). Rather, "a dispositional hearing serves the purpose of allowing

9

the circuit court to decide what further actions are in the best interests of a minor, and the hearing and ruling on whether to make a minor a ward of the court gives the parents 'fair notice of what they must do to retain their rights to their child' in the face of any future termination proceedings." *Id.* "Cases involving abuse, neglect and wardship are *sui generis*; each case must be decided on its own distinct set of facts and circumstances." *In re M.W.*, 386 Ill. App. 3d 186, 197 (2008). "Though the court, when making the wardship determination, considers the specific parent's capability to care for the child, *** the wardship determination is based on the best interest to the child when considering the totality of the circumstances surrounding the child's life." *In re D.S.*, 2018 IL App (3d) 170319, ¶ 15.

¶ 25      After a finding of warship is made, the circuit court makes a fitness finding which considers many of the same facts as the wardship finding. *In re K.E.-K.*, 2018 IL App (3d) 180026, ¶ 21. "When ruling on parental unfitness, a court is not to consider the child's best interests; 'it is the parent's past conduct in the then-existing circumstances that is under scrutiny.' " *In re Latifah* P., 315 Ill. App. 3d 1122, 1128 (2000) (quoting *In re Adoption of Syck*, 138 Ill. 2d 255, 276 (1990)). "[T]he term 'unfit' in the section relating to removing custody and guardianship from a parent following a finding of neglect differs in meaning from the unfitness required to be found for termination of parental rights for purposes of appointing a guardian with consent to adopt." *In re T.B.*, 215 Ill. App. 3d 1059, 1061 (1991).

¶ 26      The circuit court's findings regarding wardship and fitness at the dispositional hearing stage are given great deference because it has the best opportunity to view and evaluate the parties and their testimony. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006); *In re T.B.*, 215 Ill. App. 3d at 1061. Because a circuit court is in a superior position to assess the credibility of witnesses and weigh the evidence, a reviewing court will not overturn the circuit court's findings merely

because the reviewing court may have reached a different decision. *In re Lakita B.*, 297 Ill. App. 3d 985, 994 (1998). A circuit court's determination of wardship or fitness will be reversed "only if the factual findings are against the manifest weight of the evidence." *In re Kamesha J.*, 364 Ill. App. 3d 785, 795 (2006). A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent. *In re C.N.*, 196 Ill. 2d 181, 208 (2001).

¶ 27    Following a determination of wardship and a finding that the parents are unfit, the circuit court is tasked with determining a disposition that best serves the minor's interests. *In re Al. S.*, 2017 IL App (4th) 160737, ¶ 40.

> "Under section 2-27(1) of the Juvenile Court Act, the [circuit] court may commit a minor to DCFS wardship if it determines that the parent is unfit or unable, for some reason other than financial circumstances alone, to care for, protect, train, or discipline the minor and that the health, safety, and best interests of the minor will be jeopardized if the minor remains in the custody of the parent. [Citation.] *** The health, safety and interests of the minor remain the guiding principles when issuing an order of disposition regarding the custody and guardianship of a minor ward. [Citation.] The [circuit] court's determination will be reversed only if the factual findings are against the manifest weight of the evidence or if the court abused its discretion by selecting an inappropriate dispositional order. [Citation.]" *In re Kamesha J.*, 364 Ill. App. 3d at 795.

A circuit court "abuses its discretion when no reasonable person would agree with its decision." *In re M.P.*, 408 Ill. App. 3d 1070, 1073 (2011).

¶ 28    On appeal, the respondent argues the circuit court's decision to make Autumn a ward of the court was against the manifest weight of the evidence. The respondent claims Autumn's mental health "struggles alone do not automatically cast her under the jurisdiction of the court's

11

dispositional order." Additionally, he claims that no evidence was presented to explain why wardship was necessary or in Autumn's best interest. The respondent does not cite any case law to support this argument, relying instead solely on the facts outlined in the dispositional report filed on December 18, 2024.

¶ 29     Further, the respondent argues the circuit court's determination of unfitness was against the manifest weight of the evidence. To support this argument, he states that the December 18, 2024, dispositional report was not admitted into evidence and was not mentioned during the dispositional hearing. The respondent argues that even if the dispositional report is considered as evidence, the information it contains is insufficient to establish his unfitness. It is on this basis that the respondent argues that the circuit court abused its discretion by awarding guardianship of Autumn to DCFS. Again, the respondent does not cite any case law to support his argument. Instead, the respondent relies exclusively on the facts in the dispositional report, as well as the testimony of Portis and himself. We disagree and find the respondent's arguments to be lacking in merit.

¶ 30     Essentially, the respondent is requesting this court to reweigh the evidence, which is not within our purview when conducting a manifest weight of the evidence analysis. It is the responsibility of the circuit court to weigh the evidence, resolve conflicts in testimony, and assess the credibility of witnesses. See *Bernstein & Grazian, P.C. v. Grazian & Volpe, P.C.*, 402 Ill. App. 3d 961, 976 (2010). Indeed, "[a] reviewing court is not in a position to reweigh the evidence but can merely determine if the decision is against the manifest weight of the evidence." *Tate v. Illinois Pollution Control Board*, 188 Ill. App. 3d 994, 1022 (1989) (citing *Jackson v. Board of Review of the Department of Labor*, 105 Ill. 2d 501, 506 (1985)). Here, the record indicates that evidence was introduced before the court explaining the necessity of wardship and why it was in Autumn's

12

best interest. As outlined in the background section of this appeal, several witnesses, including the respondent, provided corroborating testimony regarding the factual matters that led to DCFS involvement with Autumn. See *In re J.L.*, 2016 IL App (1st) 152479, ¶ 104 (concluded the circuit court's finding was not against the manifest weight of the evidence given the corroborative evidence). In making its dispositional ruling, the circuit court stated that it had considered this evidence. Additionally, the record shows that the court considered the dispositional report, which was ordered to be prepared. Section 2-22(1) of the Act permits the court to order the preparation of a dispositional report and consider this report when making decisions at the dispositional hearing. 705 ILCS 405/2-22(1) (West 2024); see also *In re M.D.*, 2022 IL App (4th) 210288, ¶ 63 ("Essentially, there are no rules of evidence governing what the court may receive and consider at the dispositional hearing."). The circuit court is given considerable deference because it has wide latitude in considering any evidence that is relevant and helpful to its determination of a proper disposition. *In re April C.*, 326 Ill. App. 3d at 261. Based on our review of the record and the evidence presented, including the dispositional report, an opposite conclusion than that of the circuit court's is not clearly apparent. Therefore, we will not substitute our judgment for that of the circuit court.

¶ 31    Accordingly, the circuit court's findings as to wardship and fitness were not against the manifest weight of the evidence and its decision to place guardianship with DCFS was not an abuse of discretion.

¶ 32                                   III. CONCLUSION

¶ 33    For the foregoing reasons, we affirm the judgment of the Macon County circuit court.


¶ 34    Affirmed.

13